**BARCLAY DAMON LLP**
Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone: (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11, Subchapter V |
| | : | |
| GETSWIFT, INC., | : | Case No. 22-_____ (_____) |
| | : | |
| Debtor. | x | |

-------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11, Subchapter V |
| | : | |
| GETSWIFT TECHNOLOGIES LIMITED, | : | Case No. 22-_____ (_____) |
| | : | |
| Debtor. | x | |

-------------------------------------------------- x

**DECLARATION OF JOEL MACDONALD**
**PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

I, Joel Macdonald, declare, pursuant to Section 1746 of Title 28 of the United States Code, that:

1.      I am the Co-Founder, President and acting CEO of GetSwift, Inc., a Delaware corporation, and GetSwift Technologies Limited, a Canadian company, who are debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"). I also serve as a director of GetSwift Technologies Limited and GetSwift, Inc.

1

2. I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other members of the Debtors' management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called to testify, I would testify competently to the facts set forth in this Declaration.

3. I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") and in support of Debtors' (a) voluntary petitions for relief under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); and (b) various "first day" motions, including motions to approve a debtor-in-possession loan, bid procedures/sale, cash management, and the payment of wages to employees (collectively, the "First Day Motions").

4. This Declaration is divided into four parts. Part I of this Declaration provides an overview of the Debtors' business and operations, including their corporate and capital structure. Part II describes the circumstances leading to the commencement of these Chapter 11 Cases and the Debtors' proposed sale and liquidating plan. Part III sets forth the relevant facts in support of each of the Debtors' First Day Motions. Part IV provides the specific information required by Local Rule 1007-2.

**PART I: DEBTORS' BUSINESS AND OPERATIONS**

**A. The Chapter 11 Filings**

5. On this date (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under subchapter V of chapter 11 of the Bankruptcy Code. The Debtors have requested joint administration of these Chapter 11 Cases by motion filed concurrently herewith.

**B. Overview of the Debtors' Business and Corporate Organization**

6.      GetSwift Technologies Limited ("GTL") is the ultimate parent of GetSwift Inc. ("GSI"), a delivery and workforce management software-as-service (SaaS) platform that has been utilized by clients in over 70 countries and across more than 70 different verticals to automate and manage their local delivery operations and delivery drivers.  The company offers a suite of software, products, and services and focuses on business and logistics automation, and further includes ecommerce and marketplace ordering, workforce management, data analytics and augmentation, business intelligence, route optimization, cash management, task management, shift management, asset tracking, real-time alerts, cloud communications, among others.

7.      GTL was incorporated under the Business Corporations Act (British Columbia) on May 19, 2020.

8.      GTL is a holding company for its operating subsidiaries and has no meaningful operations.  Its principal asset is its listing as a publicly-traded entity in Canada.

9.      GTL's registered address is 250 Howe Street, 20th Floor, Vancouver, BC V6C 3R8 Canada.  Neither of the Debtors own, lease or hold under other arrangement, real estate from which the Debtors operates their businesses.

10.      GTL directly and wholly owns GetSwift Limited ("GSL"), a non-debtor Australian company incorporated under the Australian Corporations Act.  GTL, which was a public company trading in Australia until early 2021 before it re-domiciled to the NEO Exchange in Canada via a scheme of arrangement, is the 100% owner of GSI, a domestic corporation incorporated under the laws of the State of Delaware with a registered address of 1185 Avenue of the Americas, 3rd Floor, New York, New York 10036.

11.     GTL is a publicly-traded company on the NEO Exchange, trading under the symbol "GSW." GTL trades on the OTC Pink Sheets under the symbol "GTSWF."

12.     GSI serves both "pay-as-you-go" and subscription customers, which consist of small and medium-sized businesses, and "enterprise" customers, which are larger organizations with specific, customized needs over multiple sites.

13.     GSI owns and operates the Delivery Biz Pro ("<u>DBP</u>") and Scheduling Plus ("<u>SP</u>") platforms, along with the getwsift.com platform that it created and developed.

14.     The DBP Platform offers a subscription-based cloud service for business with scheduled, recurring product orders such as produce, meal-kit, farm-to-table, water and other home and commercial deliveries. The DBP Platform provides delivery providers with software tools to fulfill their customers recurring delivery needs.

15.     The DBP Platform combines business-critical daily functions such as an advanced customer marketplace, intelligent route assignment, customer management, billing, inventory, packing, routing, communications, reporting, procurement, and mobile friendliness.

16.     The SP Platform combines staff scheduling, task management, time and attendance, recordkeeping, and payroll into a single subscription-based cloud solution, which allows business of all sizes to reduce time spent on employee management and optimize their capital.

17.     The GetSwift platform offers a subscription-based cloud service for business with on-demand orders in industries such as food, retail, and florist. The DBP Platform provides delivery providers with software tools to fulfill their customers on-demand delivery needs.

18.     GSI also operates software development centers around the globe, including one in Belgrade, Serbia.

19.     The authorized capital of GTL consists of an unlimited number of authorized Common Shares, of which 30,764,181 are currently issued and outstanding.

**PART II:   CIRCUMSTANCES LEADING TO THE FILING OF THESE CHAPTER 11 CASES AND THE DEBTORS' PROPOSED SALE AND LIQUIDATING PLAN**

**A.  Circumstances Leading the Debtors to Chapter 11**

20.     GTL was founded in 2015 by myself and James Strauss and Rohan Bail, and incorporated under the Corporations Act in Australia.  In December, 2016, it went public and raised approximately $100 million from the capital markets.  These capital raises fueled the company's explosive growth through early 2021.

21.     In 2018, non-debtor GSL found itself defending three class action lawsuits alleging that it had breached its continuous disclosure obligations while publicly listed in Australia.  In addition, the Australian Securities and Investment Commission ("ASIC") commenced a proceeding (the "ASIC Proceeding") against GSL in 2019.  The lawsuits and the ASIC Proceeding, which were also brought against certain GSL officers at the time, drained a large amount of financial and human resources from the company and ever since, made it difficult for the company to continue its growth trajectory, as well as to attract new clients, investors and capital.  Two of the class action lawsuits were permanently stayed and one remains pending.  The ASIC Proceeding resulted in a decision against GSL and me, which is now in the penalty phase.

22.     As revenue and margins began to plateau, management began implementing a cost reduction and optimization plan.  In 2021, the company started to explore capitalization options in the form of strategic mergers, acquisitions, and financing.  An investment group – Progress Partners – was engaged and a search for capitalization was implemented.  In April,

2021, GSI also engaged three investment bankers, Progress Partners, MFS Capital Advisors, and 333 Capital, to market the business for sale, each of whom conducted extensive marketing processes. An electronic data room containing GSI's financial and business information was made available to all prospective purchasers who signed a nondisclosure agreement.

23. Those marketing efforts resulted in indications of interest from more than 25 potential purchasers and over 50 different presentations by GSI (with multiple presentations to some suitors), and led to more than 10 demonstrations of the GetSwift suite of software to potential purchasers. From these efforts, GSI received three (3) verbal expressions of interest and five (5) formal offers to purchase the business, including an offer from Stage Equity Partners, LLC ("Stage") who has emerged as the stalking horse in the sale process. Stage's agreement to serve as the stalking horse bidder (and bring in a co-investor to provide debtor-in-possession financing to fund the sale process and working capital needs pending a sale closing) comes at a critical junction following GSI's inability to reach a binding agreement to sell the business, along with cash flow struggles.

24. In February, 2022, the then CEO of the Company, Bane Hunter, resigned and I became the interim CEO, determined to lead the Company's sale efforts.

25. In May 2022, the company announced it had signed a Letter of Intent with Stage to acquire substantially all of the software assets of GSI. Part of the offer was in the form of bridge financing to ensure the company could continue operationally while it completed the transaction. At the last minute, the bridge financing partner for Stage pulled out of the financing deal and, as a result, the Debtors swiftly decided that the path to maximize the stability and value of their respective business assets was to pursue the sale via a chapter 11 filing.

**B. Proposed Sale of Substantially all of the Debtors' Assets and Liquidating Plan**

26.     In the weeks leading up to the filing of these cases, the Debtors negotiated with Stage regarding Stage's affiliate serving as a potential stalking horse bidder for substantially all of GSI's assets, and for a debtor-in-possession loan with Stage's investor in the sale, Galactic Ventures, LLC ("Galactic" or the "Lender"), to help fund the filing of, and the orderly sale of assets in, these Chapter 11 Cases.

27.     As set forth in more detail below, the Debtors and Galactic have entered into a debtor-in-possession loan agreement for a post-petition loan in the amount of $1,000,000 (the "DIP Loan"), and the Debtors and SF2 GSW LLC (the "Stalking Horse Bidder"), an affiliate of Stage, have entered into an asset purchase agreement (the "APA") under which  would serve as the stalking horse bidder, both subject to the Court's approval.  The Sale Motion and DIP Financing Motion are dependent upon each other, such that, for example, any funding of the DIP Loan is conditioned upon approval of bid procedures.

28.     The thirteen week budget attached to the Debtors' DIP Financing Motion reflects that the DIP Loan is contemplated to provide the Debtors with sufficient liquidity in these cases to sell their assets, confirm a plan of liquidation, and close these cases expeditiously.

**PART III:   RELEVANT FACTS IN SUPPORT OF EACH OF THE DEBTORS' FIRST DAY MOTIONS**

29.     In furtherance of these objectives, the Debtors expect to file seven First-Day Motions and proposed orders and respectfully request that the Court consider entering the proposed orders granting such First-Day Motions on an interim and final basis, as applicable.  I have reviewed, or otherwise had explained to me, each of the First Day Motions and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief based upon the information provided to me by the

various professionals associated with the Debtors, to the extent not already known by me. Moreover, I believe that the relief sought in each of the First Day Motions (a) is important to enable the Debtors to make the transition to chapter 11 with minimum disruption or loss of value, and (b) constitutes a critical element in achieving the Debtors' successful orderly liquidation and wind-down.

### A. Administrative

#### a. Joint Administration of Cases

30.     The Debtors are seeking the joint administration of their Chapter 11 Cases.

31.     I believe that it would be far more practical and expedient for the administration of these Chapter 11 Cases if the Court were to authorize their joint administration. Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect both of the Debtors. Hence, joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications, and orders.

#### b. Appointment of Foreign Representative

32.     GTL, a corporation that is incorporated under the *Business Corporations Act* (British Columbia), intends to seek ancillary relief in Canada, shortly after the commencement of these Chapter 11 Cases, on behalf of the Debtors' estates pursuant to the CCAA to request that the Canadian Court recognize these Chapter 11 Cases as a "foreign main proceeding" under the CCAA.

33.     The Debtors are seeking authorization for GTL to act as Foreign Representative on behalf of the Debtors' estates in any judicial or other proceedings in a foreign country, including the Canadian Proceeding.  To commence the Canadian Proceeding, the Debtors require

authority for a person or body to act as the "foreign representative" on behalf of the Debtors' estates.

**B. Business Operations**

**a.  Cash Management**

34.     Prior to the commencement of the Debtors' Chapter 11 Cases, the Debtors, in the ordinary course of business, used a cash management system to collect, transfer, and disburse funds and to record all such transactions as they are made (the "Cash Management System"). The Debtors are seeking to continue to use the Cash Management System during the Chapter 11 Cases as necessary.

35.     The Debtors receive advance deposits from customers for their purchases, which deposits are routed to the operating account.  These purchases represent the significant majority of the Debtors' revenue.  If the stream of deposits were interrupted for even a short period, the Debtors' operations would be severely impacted and its ability to adequately deliver its products would be compromised. The Debtors' employees also receive their wages through direct deposit from the Debtors' Capital One accounts into their bank accounts. Finally, the Debtors' accounts receivables are paid into the First Republic Bank accounts.

36.     I believe it is in the best interests of the Debtors to keep their existing Cash Management System in place to facilitate the operation of their business and funding of chapter 11 expenses because it would avoid the unnecessary administrative issues and expense that would result from requiring the Debtors to adopt a new cash management system. Were the Debtors required to close their existing accounts an open new accounts, their ability to receive revenue and pay its vendors would be significantly interrupted.

**b.   Wages**

37.     As of the filing of the Debtors' Chapter 11 Cases, GSI has 9 employees and 44 foreign contractors.

38.     Through the Wages Motion, GSI is seeking authority to (i) pay wage obligations, expense reimbursements, payroll taxes, and employee benefits, (ii) maintain and continue to honor its practices, programs, and policies for its employees, and (iii) authorize Capital One to receive, honor, process, and pay any and all EFTs and wire transfers[1] drawn on GSI's accounts in satisfaction of employee obligations and employee benefits.

39.     In the ordinary course of business, the Debtors typically pay Wage Obligations on a periodic basis through direct deposits to Employees, who are paid every two weeks, in arrears. The Debtors' payroll therefore compensates Employees for work already performed, and the Debtors' current estimated gross payroll is approximately $48,000 every other week.  The estimated amount of bi-weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the 30 day period following the Petition Date is $51,000.  The estimated portion of that amount proposed to be paid to officers, stockholders and directors is $52,000.

40.     The estimated amounts owed to the foreign independent contractors it utilizes across the globe to support and grow its international business for the 30 day period following the Petition Date is $36,000 (the foreign independent contractors are paid monthly).

41.     The Debtors are also required by law to withhold from its Employees' wages the Withholding Taxes and to remit same to the Taxing Authorities.  The Debtor engages ADP to

---

[1] The Debtors do not issue paper checks from a checkbook; rather, all of the Debtors payments are made electronically.

manage payroll withholding and withholding tax payment services for the Debtors and pays ADP an administrative fee on a monthly basis for these services.

42.     Occasionally, the Debtors' Employees incur various expenses in the discharge of their ordinary duties, and the Debtors provide Expense Reimbursements in those scenarios. Instead of being made through payroll, the Expense Reimbursements are accomplished by EFT on an ad hoc basis.

43.     The Debtors also offer Eligible Employees PTO Plans, and all Employees are eligible for Health and Welfare Plans and a 401(k) Plan.

**C. DIP/Sale**

**a.   DIP Financing/Cash Collateral**

44.     Shortly before the filing of these cases, the Debtors, Stage and Galactic negotiated the DIP Loan and the APA, both subject to the Court's approval, to establish Stage's stalking horse bid for substantially all of GSI's assets and for a loan to help fund the filing of, and the orderly sale of assets in, these Chapter 11 Cases.

45.     The Debtors urgently require the DIP Loan to maintain their operations and businesses during the Chapter 11 process.  In the absence of available working capital, the Debtors would be forced to cease their operations and discontinue service to their customers, which would result in permanent and irreparable harm to the Debtors' business and a loss of value to the Debtors' estates and their creditors.  The DIP Loan is therefore critical to the Debtors' efforts to sell their assets through an orderly, court-supervised process and confirm a plan of liquidation resulting from same.

46.     The thirteen (13) week budget attached to the DIP Financing Motion reflects that the DIP Loan is contemplated to provide the Debtors with sufficient cash in these cases to sell their assets, seek confirmation of a plan of liquidation, and close these cases expeditiously.

47.     Under the proposed Loan Agreement, Lender will provide a revolving line of credit facility, advances that will be secured by liens under 11 U.S.C. §§ 364(c), and, if the collateral proves inadequate, Lender will be entitled to superpriority administrative expense treatment.  As noted, the Debtors have signed an APA with the proposed Stalking Horse Bidder in connection with the Debtors' proposed sale of substantially all of the assets of GSI's SaaS (software) business.

48.     Prior to the Petition Date, the Debtors had no borrowing facilities, instead relying on its revenue generation to fund operations.

49.     Pursuant to Federal Rule of Bankruptcy Procedure 4001(c), the following summarizes certain provisions of the proposed Debtor in Possession Loan Agreement between Debtor as borrower and Galactic as lender for a post-petition credit facility in the original principal amount of up to $1,000,000, and the terms of the Proposed Order approving the same:

| Provision | Location in Proposed Order |
|---|---|
| Interest Rate:  1.5% per month (18% per annum) | Paragraph 6, referencing Loan Agreement attached hereto as Exhibit 1. |
| Facility terminates on earlier to occur of an Event of Default that is not cured within any applicable cure period or October 3, 2022. | Paragraph 6 |
| Events of Default include:  Failure to make timely payments; occurrence of an Event of Default under Loan Agreement; any representation or warranty of Debtor proving to be false or misleading in any material respect. | Paragraph 6, referencing Loan Agreement attached hereto as Exhibit 1 |
| Liens:  Liens under Section 364(c) on all of Debtor's assets. | Paragraphs 10, 12, 22 |
| Borrowing Limit: $1,000,000. | Paragraph 6 |

| Borrowing Conditions: lack of default; entry of orders approving Loan Agreements | Paragraph 6, referencing Loan Agreement attached hereto as Exhibit 1, paragraph 19 |
|---|---|
| Automatic stay terminated upon Event of Default and expiration of cure period, if any. | Paragraph 17 |

**b. Bid Procedures/Sale**

50. The goal of these Chapter 11 Cases it to consummate a sale of the Debtors' assets that will maximize recoveries for the Debtors' estates and maintain a viable business. Pre-petition, the Debtors underwent an extensive marketing process that included: (i) engaging three investment bankers; (ii) setting up an electronic data room; (iii) processing indications of interest from over 25 potential purchasers; (iv) making over 50 presentations to prospective purchasers (including multiple to certain of them); and (v) demonstrating GetSwift's suite of software over 10 times to such parties.

51. Those efforts resulted in three (3) verbal expressions of interest and five (5) formal offers to purchase the business. In May 2022, GetSwift signed a letter of intent with Stage for Stage to acquire all of the software assets of GSI. Part of the offer was in the form of bridge financing to ensure the company could continue operationally while it completed the transaction. However, at the last minute, Stage's bridge financing partner pulled out and, as a result, the Debtors quickly decided that the path to maximize the stability and value of their respective business assets was to pursue a sale of substantially all of their assets via a chapter 11 filing.

52. Despite the setback, the Debtors subsequently negotiated an APA with Stage for its affiliate to serve as the stalking horse bidder in seeking to acquire substantially all of GSI's software assets. The APA provides for a Break-Up Fee as an inducement for Stage's affiliate to serve as stalking horse bidder to set the floor for what will hopefully be a robust sale process,

which is a continuation of the Debtors' extensive pre-petition efforts. The Sale Motion is therefore among the most critical of the First Day Motions.

53. The Sale Motion is bifurcated, first seeking a Bid Procedures Order and then a Sale Order. The Debtors are looking to sell substantially all of their assets via a fulsome bidding (and potential auction) process that invites the marketplace to participate while also allowing the Debtors to expeditiously maximize value for their creditors and exit chapter 11.

54. The Sale Motion first seeks approval of (i) Bid Procedures to be implemented in connection with the Sale, including the designation of Stage (through its affiliate) as the stalking horse bidder, (ii) procedures in connection with the Debtors' assumption or assumption and assignment to the Successful Bidder or Backup Bidder of certain Assigned Contracts, along with any Cure Amounts to be paid in connection with such assumption and/or assumption and assignment, (iii) Notice Procedures to advise parties in interest and Potential Bidders of the Bid Procedures, the Auction, the Sale Hearing, and the Debtors' intent to assume or assume and/or assume and assign Assigned Contracts and the alleged Cure Amounts, and (iv) related relief, including the Break-Up Fee (collectively, the "<u>Bid Procedures Relief</u>").

55. If and when the Bid Procedures Relief is granted, the Debtors will engage in vigorously marketing the assets under the APA, hopefully culminating in an auction. They will, ultimately, seek approval of (i) the Sale of the Assets free and clear of liens, claims, encumbrances, and other interests, except as provided for in the APA, (ii) assumption and/or assumption and assignment of the Assigned Contracts, and (iii) related relief.

## PART IV:    OTHER INFORMATION REQUIRED BY LOCAL RULE 1007-2

56.    GSI's assets consist solely of its business operations and its cash on hand at the time of the filings.  The Debtors total amount of cash on hand at the time of the filings is approximately $50,000.

57.    GSI has no secured liabilities and approximately $50,000 in unsecured priority liabilities.

58.    GSI has general unsecured liabilities of approximately $1,632,343.16, the majority of which amount stems from amounts allegedly due to Eplexity.

59.    GTL has no secured liabilities and no unsecured priority liabilities.

60.    GTL has general unsecured liabilities of approximately $1,385,495.28, the majority of which stems from disputed obligations for prepetition fees for legal services provided by Dentons US LLP.

61.    None of the Debtors' assets are in the possession or custody of any entity other than the respective Debtor.

62.    The Debtors' books and records are maintained at its offices at 1185 Avenue of the Americas, 3rd Floor, New York, New York 10036.  Copies of the books and records may also be in the possession of the Debtors' accountants, WD Numeric.  None of the Debtors' assets are located outside the territorial limits of the United States , other than the corporate shell of GTL.

63.    Joel Macdonald, GSI's CEO, and Robert Bardunias, GSI's COO, will receive their regular bi-weekly compensation of $14,140.00 and $10,192.31 respectively, during the thirty days after the filing of the Chapter 11 petition as a result of the work they perform for GSI in the first thirty days of these cases.

**64.** A schedule showing the anticipated cash receipts and disbursements, and accrued but unpaid obligations incurred in the thirty (30) day period following the filing of the petition is annexed hereto as Exhibit 2.

65. I am the Debtors' acting CEO and President, and I also serve as a Director of the Debtors. I founded GetSwift in 2015 and have been with the Debtors ever since, including working to raise $100,000,000 in capital and bring GetSwift public in 2017. My responsibilities include all aspects of executive operations, company strategy, business development, and the main point of communications between the Debtors' boards, and their business operations.

66. GSI's COO, Robert Bardunias, joined the company in 2018. Mr. Bardunias works closely and communicates effectively with GSI's customers, vendors, and other parties interacting with GSI, and supports the day to day activities of GSI's business.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 2, 2022

_____
JOEL MACDONALD

# EXHIBIT 1

## DEBTOR-IN-POSSESSION LOAN AGREEMENT

THIS DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "Agreement"), dated August 2, 2022, is entered into between GetSwift, Inc. ("Inc."), a corporation organized under the laws of the State of Delaware, and GetSwift Technologies Limited, a Canadian company ("Technologies" and, together with Technologies and Inc., the "Debtors" or the "Borrowers"), jointly and severally, on one hand, and Galactic Ventures LLC, a limited liability company organized under the laws of the State of Wyoming ("Galactic" or "Lender"), on the other hand.

W I T N E S S E T H:

WHEREAS, on August 2, 2022 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Subchapter V of chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court"); and

WHEREAS, the Debtors have requested that Lender make a DIP Loan (as defined hereinafter) to the Debtors, subject to the terms and conditions set forth herein, for the purpose of funding the Debtors' post-petition obligations pending a sale of Debtor Inc.'s assets related to its SaaS Business (as defined below) pursuant to a motion to be filed on or about the Petition Date; and

WHEREAS, Lender is willing, on the terms and conditions hereinafter set forth, to make such a DIP Loan.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the parties hereto agree as follows:

SECTION 1.  DEFINITIONS.

<u>Defined Terms</u>.      Certain terms are defined in the text of this Agreement. In addition, as used in this Agreement, the following terms shall have the following meanings:

"Agreement" means this Debtor-in-Possession Loan Agreement, as it may hereafter be amended, modified, extended, restated or supplemented from time to time.

"Avoidance Actions" means causes of action of Debtors' estates arising under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code.

"Bankruptcy Code" means Title 11 of the United States Code, as may hereafter be amended from time to time.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as may be amended from time to time.

"Budget" means the budget annexed hereto, and any subsequent budget for use of the proceeds of the DIP Loan that may be agreed upon by the Debtors and the Lender, in writing.

"Business Day" means any day on which banks are required to be open in New York.

"Carve Out" shall mean a carve out for up to $5,000 for Chapter 7 reasonable trustee fees and expenses, if applicable.

"Chapter 11 Cases" means these voluntary bankruptcy cases of the Debtors.

"Closing" means the closing of the sale transaction under the Sale Motion.

"Collateral" means all Property securing the DIP Obligations hereunder, including, without limitation all assets, all real property and all personal property, tangible or intangible, including without limitation all bank accounts, deposits and cash, wherever located, whether now existing or hereafter acquired, of the Debtors, and all proceeds (including the proceeds of any asset sales to third parties), products, rents, revenues and profits of any of the foregoing, all causes of action (except Avoidance Actions), and such other collateral of any nature as may be provided as security for the DIP Obligations in the DIP Order or otherwise.

"Debtor Representative" shall mean Joel Macdonald, Interim Chief Executive Officer and President of Debtor Inc., or any agent of the Debtors designated by the foregoing to act as an authorized Debtor Representative hereunder.

"Default" means any event specified in Section 6 hereof, whether or not any requirement in connection with such event for the giving of notice, lapse of time, or happening of any further condition has been satisfied.

"Default Rate" has the meaning given such term in Section 3 hereof.

"DIP Loan" has the meaning given such term in Section 2 hereof.

"DIP Loan Commitment" means the commitment of the Lender to loan the Debtors an aggregate principal amount of up to $1,000,000 on a final basis, including up to $500,000 on an interim basis, subject to Court approval of interim and final DIP Orders in form and substance acceptable to the Lender.

"DIP Loan Documents" means, collectively, this Agreement, the interim and final DIP Orders, and each other order of the Court and each other instrument, document or agreement required to be delivered pursuant to this Agreement or any order of the Court or delivered in connection with this Agreement, including without limitation any documents or instruments executed or delivered by any Entity from time to time as security for the DIP Obligations, in each case as amended, modified, waived, substituted, replaced or extended from time to time.

"DIP Obligations" means all present and future obligations, indebtedness and liabilities, and all renewals and extensions of all or any part thereof, of the Debtors to Lender arising from, by virtue of, or pursuant to this Agreement, any DIP Loan Documents, and any and all renewals and extensions thereof or any part thereof, or future amendments thereto, all interest accruing on all or any part thereof and the reasonable attorneys' fees incurred by Lender for the negotiation and preparation of this Agreement and consummation of the same, execution of waivers, amendments and consents, and in connection with the enforcement or the collection of all or any part thereof, and reasonable attorneys' fees incurred by Lender in connection with the enforcement or the collection of all or any part of the DIP Obligations during the continuance of a Default, whether such obligations, indebtedness and liabilities are direct, indirect, fixed, contingent, joint, several or joint and several.

"Entity" means an individual, partnership, limited liability company, joint venture, corporation, trust, Governmental Unit, unincorporated organization, and government, or any department, agency, or political subdivision thereof.

"Event of Default" shall refer to defaults as set forth in Section 6 hereof.

"DIP Order" means the interim and final orders entered by the Court upon sufficient notice as required by Bankruptcy Rule 4001, in form and substance satisfactory to Lender, in its sole discretion, approving the DIP Loan and the DIP Loan Documents.

"Final Order" means an order, ruling or judgment of a court of competent jurisdiction (a) that is in full force and effect, (b) that is not stayed, (c) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired, and no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, and (d) is no longer subject to review, reversal, modification or amendment by appeal or writ of certiorari; provided, however, that an order will be deemed a Final Order notwithstanding the filing of a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules.

"Governmental Unit" means any state, commonwealth, federal, foreign, territorial, or other court or government body, subdivision, agency, department, commission, board, bureau, or instrumentality of a governmental body.

"Highest Lawful Rate" means, at the particular time in question, the maximum rate of interest which, under applicable law, Lender is then permitted to charge on the DIP Obligations. If the maximum rate of interest which, under applicable law, Lender is permitted to charge on the DIP Obligations shall change after the date hereof, the Highest Lawful Rate shall be increased or decreased automatically, as the case may be, from time to time as of the effective time of each change in the Highest Lawful Rate without notice to the Debtor.

"IFRS Standards" means the high quality global accounting principles used in Canada as in effect from time to time.

"Law" means any constitution, statute, law, ordinance, regulation, rule, order, writ, injunction, or decree of any Governmental Unit.

"License" means any license, permit, consent, certificate of need, authorization, certification, accreditation, franchise, approval, or grant of rights by, or any filing or registration with, any Governmental Unit or other Entity necessary for such Entity to own, build, maintain, or operate its business or property.

"Lien" means any properly filed and perfected mortgage, pledge, security interest, encumbrance, lien, or charge of any kind, including without limitation any agreement to give or not to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement or other similar form of public notice under the Laws of any jurisdiction.

"Litigation" means any proceeding, claim, lawsuit, arbitration, and/or investigation conducted by or before any Governmental Unit or arbitrator including, without limitation, proceedings, claims, lawsuits, and/or investigations under or pursuant to any environmental, occupational, safety and health, antitrust, unfair competition, securities, Tax, or other Law, or under or pursuant to any contract, agreement, or other instrument.

"Material Adverse Change" means any circumstance or event that, by itself or aggregated together with all other events or circumstances, is or would reasonably be expected to materially and adversely affect the validity or enforceability of or any rights of Lender under the DIP Loan Documents, or the DIP Order.

"Permitted Liens" means:

(a)     Any Lien in favor of Lender pursuant to the DIP Loan Documents, or the DIP Order to secure the DIP Obligations hereunder;

(b)     Liens existing on the Petition Date or any replacement liens;

(c)     Liens on (i) real estate for real estate Taxes not yet delinquent and (ii) Liens for Taxes, assessments, governmental charges, levies or claims that are being diligently contested in good faith by appropriate proceedings and for which adequate reserves shall have been set aside on the Debtors' books, but only so long as no foreclosure, restraint, sale or similar proceedings have been commenced with respect thereto;

(d)     Liens of carriers, warehousemen, mechanics, laborers and materialmen and other similar Liens incurred in the ordinary course of business for sums not yet due or being contested in good faith, if such reserve or appropriate provision, if any, as shall be required by GAAP shall have been made therefore; and

(e)     Liens incurred in the ordinary course of business after the Petition Date in connection with worker's compensation, unemployment insurance or similar legislation.

"Permitted Weekly Variance" shall mean a weekly variance of up to ten percent (10%) with respect to any one line item of the Budget, provided that the overall weekly disbursements do not exceed one hundred ten percent (110%) of the budgeted expenses of the Debtor, as reflected in the Budget.

"Property" means all types of real, personal, tangible, intangible, or mixed property, whether owned or hereafter acquired in fee simple or leased by the Debtors.

"SaaS Business" means the Debtors' delivery management software-as-service business.

"Sale Motion" shall mean the Debtors' motion, in form and substance satisfactory to Lender, in its sole discretion, for a sale of Debtor Inc.'s SaaS Business and providing for the

Lender's right to credit bid any DIP Obligations due and owing, with the Closing to occur on or before October 3, 2022.

"Sale Procedures Order" shall mean an order establishing sale procedures governing the sale of the Debtors' assets under the Sale Motion and designating SF2 GSW LLC as the "stalking horse" thereunder, and which Sale Procedures Order is in form and substance acceptable to Lender.

"Schedules" means, collectively, the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtors in the Chapter 11 Cases.

"Superpriority Claims" means any debt or other claim arising out of credit obtained or debt incurred by the Debtors having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"Tax" or "Taxes" means all taxes, assessments, imposts, fees, or other charges at any time imposed by any Laws or Governmental Unit.

"Tax Code" means the Internal Revenue Code of 1986, as amended, and the Income Tax Act (Canada), relating to Inc. and Technologies, respectively.

"UCC" means the Uniform Commercial Code as adopted in the State of New York as of the date of this Agreement.

"U.S. Trustee" means the United States Trustee for Region 2.

Other Definitional Provisions.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any other DIP Loan Document or any certificate or

other document made or delivered pursuant hereto.

(b)     As used herein, in any other DIP Loan Document and in any certificate or other document made or delivered pursuant hereto, accounting terms relating to the Debtors not defined herein, and accounting terms partly defined herein to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.


SECTION 2.   DIP LOAN.

DIP Loan Commitment.  Subject to and in accordance with the terms and

conditions of this Agreement (including, without limitation, the entry of a DIP Order that is

satisfactory to Lender, in its sole discretion) Lender shall make advances to the Debtor up to the

maximum principal amount of the DIP Loan Commitment (the "DIP Loan").

Term.  The Term of the DIP Loan Commitment shall be from the date of entry of

the interim DIP Order through October 3, 2022 (the "Term").  Upon the earlier of the date of the

Closing or the expiration of the Term, unless otherwise extended by Lender, in its sole

discretion, all amounts due and owing under the DIP Loan, including principal, interest and fees,

shall immediately become due and owing to Lender if not previously paid.

Advances.  Provided that no Default shall have occurred and no circumstances

exist that, with the giving of notice and/or the passage of time, would constitute a Default,

advances under the DIP Loan shall be made if and when requested in writing on behalf of the

Debtor by the Debtor Representative in order to meet the Debtor's cash needs as set forth in the

Budget.  The Debtor Representative will be required to make any requests for advances from the Lender in writing by 12:00 noon on the Friday preceding the week during which such advances are required in accordance with the Budget and the Debtors' cash position.

Initial Advance.        Lender agrees that the initial advance under the DIP Loan shall be in the amount of $150,000, payable upon the entry of the interim DIP Order and the Sale Procedures Order.

Advances.  Provided that no Default shall have occurred and no circumstances exist that, with the giving of notice and/or the passage of time, would constitute a Default, advances shall be made under the DIP Loan upon request by the Debtor Representative, for those weeks when the cash flow budget projects that the Debtor's cash balance will fall below $50,000.

Use of Proceeds.  The proceeds of the DIP Loan shall be used by the Debtors for the sole purpose of financing expenditures in accordance with the Budget, subject to the Permitted Weekly Variance.

Collateral.  As provided in the DIP Order, all indebtedness, including DIP Obligations under this Agreement and the DIP Loan Documents shall be secured by automatically perfected security interests and Liens in the Property granted pursuant to Section 364(c)(2) of the Bankruptcy Code.

Monthly Interest Payments.  The Debtors shall pay monthly interest payments to the Lender in accordance with the terms of this DIP Loan, as computed in accordance with Section 3 of this Agreement.  Monthly interest payments shall automatically accrue and be capitalized to the principal amount of the DIP Obligations, and shall thereafter be deemed to be a

10

part of the principal amount of the DIP Obligations.  All principal and interest payments, and any additional legal fees, shall be made on the date of the Closing.

Prepayment.  The unpaid principal amount of the DIP Loan, together with any and all accrued interest thereon through the date of prepayment, may be voluntarily paid or prepaid, in whole or in part, without premium or penalty.

DIP Order.  For the avoidance of doubt and without waiving any discretion or other rights reserved to the Lender in this Agreement, unless otherwise consented to by the Lender through written authorization, the DIP Order, if any, will not be acceptable to the Lender and no DIP Loan shall be funded by the Lender, unless an interim DIP Order is entered on or before August 5, 2022 containing, inter alia, the following provisions:  (a) a valid, perfected lien on all of the Collateral shall be granted to Lender to secure repayment of the DIP Loan; (b) a Superpriority Claim shall be granted to the Lender against the Debtor in an amount no less than the DIP Obligations; and (c) that Lender's obligation to lend under the DIP Order and DIP Loan are contingent   upon entry of the interim DIP Order and entry of the Sale Procedures Order.  It shall be an Event of Default under the DIP Order, if any, if the Debtor shall  fail to secure the entry of a final DIP Order of the Bankruptcy Court, in form and substance acceptable to Lender on or before August 27, 2022.

SECTION 3.   GENERAL PROVISIONS APPLICABLE TO DIP LOAN.

No Note.  This Agreement, and the DIP Orders fully evidence and memorialize the DIP Obligations, and no other instrument is required to evidence such DIP Obligations.

Interest Rates.  (a) Interest Rate.  The DIP Loan shall bear interest at a rate of 1.5% for each month or partial month until repayment is effected in full.

11

(b) Default Rate.  Upon the occurrence and during the continuance of a Default, and provided that Lender shall have provided a Notice of Default as provided herein and any applicable cure period has expired, the DIP Loan and all other amounts unpaid and outstanding under this Agreement shall bear interest at a rate equal to 150%..  In addition, upon any Event of Default, a one-time Default Fee of $50,000 will be assessed on the Borrowers (the "Default Rate").

Computation of Interest.   Interest on the advances shall be computed on a calendar month basis based upon the highest principal balance of the loan for that full or partial period for which such interest is payable, unless such calculation would exceed the Highest Lawful Rate, in which case interest shall be reduced to reflect the Highest Lawful Rate.

Commitment and Administrative Fees.  An origination fee of $15,000, and an administrative fee of $5,000, shall apply to the DIP Loan, and Lender is authorized to advance an amount equal to such fees from the DIP Loan proceeds payable during the week of August 1, 2022 –the first advance - upon the dates of entry of the interim DIP Order and Sales Procedures Order.

Collateral.

(a)     Grant of Security Interest.  The Debtors hereby grant to Lender a security interest in all of their respective Collateral as security for the full and prompt payment in cash  and performance of the DIP Obligations.

(b)     Perfection; Duty of Care.  Until all the DIP Obligations have been paid and performed in full, the Debtors shall take all actions reasonably requested by Lender or otherwise required to perfect, maintain and protect Lender's security interest in the Collateral, including delivering to Lender all Collateral in which Lender's security interest may be perfected by possession together with such endorsements as Lender may request.  The Debtors shall pay when due all Tax assessments and other charges imposed upon or with respect to the Collateral or any part thereof, first arising after the Petition Date, unless such assessments and charges are

subject to a good faith contest adequately reserved for by the Debtors.  If the Debtors shall fail to pay such amounts, upon prior written notice to the Debtors, Lender may do so and add the amount of such payment to the principal owed under the DIP Loan.  Upon prior written notice to the Debtors, Lender may discharge any Lien that is not a Permitted Lien, pay for any insurance, or take any other action the Debtors are required to take pursuant to this Agreement but have not taken, and add the amount of such payment to the principal owed under the DIP Loan.

SECTION 4.   AFFIRMATIVE COVENANTS.

The Debtors hereby agree that, so long as any portion of the DIP Loan or other DIP Obligation remain outstanding and unpaid or any other amount is owing to Lender hereunder, the Debtors shall be obligated as follows:

Post-Petition Obligations.  Pay, discharge or otherwise satisfy all  post-Petition Date obligations and liabilities as required pursuant to the Bankruptcy Code or by order of the Court.

Insurance.  (i) Maintain with financially sound and reputable insurance companies insurance on all Collateral in at least such amounts and with only such deductibles as are usually maintained, and against at least such risks as are usually insured against in the same general area, by companies engaged in the same or a similar business; and furnish to Lender, at their request, full information as to the insurance carried, and (ii) name Lender as an additional insured and as its interests may appear on all insurance maintained by the Debtors pursuant to the preceding subparagraph,

Books and Records.  Keep proper books of record and account in which complete and correct entries are made of all dealings and transactions in relation to the Debtors' business and activities and which permit financial statements to be prepared in conformity with GAAP and all applicable Laws.

Cash Accounts.  Deposit and maintain all proceeds of the DIP Loan in only such accounts permitted by the Court's order approving the Debtors' use after the Petition Date of their existing bank accounts and cash management system.

Visits and Inspections.  Promptly permit representatives of Lender, upon prior written notice to the Debtors, from time to time during normal business hours to (a) visit and inspect any Property of the Debtors as often as Lender shall reasonably deem advisable, (b) make such inspections of, abstracts from and copies of the Debtors' books and records as Lender shall deem advisable, and (c) discuss with the Debtors' directors, officers and the auditors of the Debtors, the Debtors' business, operations, assets, liabilities, financial positions, results of operations and business prospects as often as Lender shall deem advisable.

Weekly Meetings.   As a condition to each advance after the Initial Advance the Debtor Representative shall meet with a representative of Lender, at a mutually agreeable time each week to review Debtor's use of cash and agree on additional advances

Use of Proceeds.  Use of the proceeds of the DIP Loan shall be solely in accordance with the Budget,h subject to the Permitted Variances and upon the terms and conditions set forth in this Agreement.

Compliance with Law.  Comply in all material respects with all requirements of law applicable to the Property (including but not limited to requirements relating to the environment or hazardous or toxic substances) and the Bankruptcy Code.

SECTION 5.   NEGATIVE COVENANTS.

The Debtors hereby agree that they shall not, directly or indirectly so long as the DIP Loan or any of the DIP Obligations remain outstanding and unpaid, or any other amount is owing to Lender hereunder (it being understood that each of the permitted exceptions to each of the covenants in this <u>Section 5</u> is in addition to, and not overlapping with, any other of such permitted exceptions except to the extent expressly provided):

<u>Debt</u>. Other than in connection with the full payment of the financing and DIP Loan provided under this Agreement, create, incur, assume or suffer to exist any debt, except: (i) Debt in existence on the date of this Agreement; (ii) the DIP Loan and this Agreement; and (iii) debt incurred by the Debtors within the Budget, subject to the Permitted Weekly Variance, in the ordinary course of business in the form of accounts payable and accrued expenses.

<u>Limitation on Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of their property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens and the Carve Out.

<u>Use of Proceeds</u>. Use the proceeds of the DIP Loan for any purpose not set forth in each respective Budget, subject to the Permitted Weekly Variance, and shall not be used by the Debtors to assert or prosecute any claim, demand or cause of action against the Lender.

<u>DIP Financing</u>. Other than in connection with the full payment of the financing and DIP Loan provided under this Agreement, incur, or apply to the Court for authority to incur, or suffer to exist, any (i) indebtedness having the priority afforded by Section 364(c) or (d) of the Bankruptcy Code (including any Superpriority Claims) other than the financing provided for under this Agreement and the other DIP Loan Documents or (ii) obligation to make adequate protection payments, or otherwise provide adequate protection, other than as contemplated by the

DIP Order or in the Budget, or as may be required by order of the Court in connection with the provision of adequate protection to holders of Permitted Liens whose collateral is sold or otherwise disposed of or as to which Lender consents.

Alteration of Rights of Lender.  Limit, affect or modify, or apply to the Court to limit, affect or modify, any of Lender's rights with respect to the DIP Obligations, including rights with respect to the Collateral and the priority thereof, except with the prior written consent of Lender.

Chapter 11 Claims.  Other than in connection with the full payment of the financing and DIP Loans provided under this Agreement,  apply to the Court for the authority to incur, create, assume, suffer or permit any claim, Lien or encumbrance (other than Permitted Liens and the Carve Out) against the Debtors, or any of their assets in the Chapter 11 Cases to be pari passu with, or senior to, the Liens and claims of Lender granted and arising under the DIP Loan Documents.

Superpriority Administrative Expense.  Other than in connection with the full payment of the financing and DIP Loans provided under this Agreement,  create or permit to exist any Superpriority Claims (other than with respect to this Agreement, the DIP Order and the Carve Out).

Transfers.  Other than in connection with the full payment of the financing and DIP Loans provided under this Agreement,  transfer, directly or indirectly, any of its right, title or interest in, to or under any of the Collateral without the Lender's prior written consent.


SECTION 6.   DEFAULT.

16

Default.  In addition to the Events of Default under the DIP Order, the following shall constitute Events of Default:

(a)     The Debtor <u>shall</u> fail to pay any principal or interest of the DIP Loan or any other DIP Obligation (including any fees or reimbursable amounts) when any such amount becomes due in accordance with the terms hereof, which failure continues for a period of five (5) Business Days after notice thereof from Lender; or

(b)     The Debtor shall default in the observance or performance of any covenant, agreement, obligation or restriction set forth in this Agreement or any other DIP Loan Document, and such Default shall continue for a period of ten (10) Business Days after notice thereof from Lender; or

(c)     The Court shall enter an order with respect to either Debtor dismissing the Chapter 11 Case or converting it to a case under chapter 7 of the Bankruptcy Code, or, without the prior written consent of Lender (i) appointing a trustee in the Chapter 11 Cases or (ii) appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Debtors' business (beyond those set forth in Section 1106(a)(3) or (4)) under Bankruptcy Code Section; or

(d)     The Debtors shall fail to comply with the terms of the DIP Order; or

(e)     There occurs any Material Adverse Change, including without limitation, any impairment to the value of Collateral which Lender, in good faith, deems will threaten timely payment in full of the DIP Loan; or

(f)     The Court grants any superpriority administrative expense claim or Lien or enters any order granting relief from the automatic stay (if not in favor of Lender) on any assets of the Debtors, except with the express written consent of Lender or

(g)     The Debtors shall assume or reject any unexpired lease or executory contract relating to the Collateral without the prior written consent of the Lender; or

(h)     The DIP financing is used by the Debtors to assert or prosecute any claim, demand or cause of action against the Lender; or

(i)     The Closing of the sale under the Sale Motion pursuant to order of the Court shall not have occurred prior to October 3, 2022, , or such other date to which Lender agrees in writing.

Notice of Default and Certain Remedies.  If any Default shall occur, Lender may provide written notice of such Default (a "<u>Notice of Default</u>") to the Debtors , the subchapter V

17

trustee, or his/her counsel, if any, and the U.S. Trustee.. If a Default shall have occurred and Lender shall have provided a Notice of Default, then, upon expiration of any applicable cure period, so long as any such Default shall be continuing, any of the actions set forth in the next sentence may be taken upon written notice by Lender to the Debtors, the U.S. Trustee, and the Subchapter V trustee. Lender may (a) without further order of the Court, declare the DIP Loan Commitment reduced to zero whereupon the DIP Loan Commitment and all obligations of Lender relating thereto shall be immediately terminated, (b) without further order of the Court, declare all or a portion of the DIP Loan (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the same shall immediately become due and payable, without further notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, protest, or other formalities of any kind, all of which are hereby expressly waived by the Debtors, (c) foreclose or otherwise enforce any Lien granted to Lender for the benefit of itself to secure payment and performance of the DIP Obligations in accordance with the terms of the DIP Loan Documents, and (d) exercise all other rights and remedies available at law or in equity. Except as expressly provided above in this Section, presentment, notice, notice of dishonor, notice of acceleration, notice of intent to accelerate, demand, protest and all other notices of any kind are hereby expressly waived.

SECTION 7. MISCELLANEOUS.

Amendments and Waivers. No DIP Loan Document nor any terms thereof may be amended, supplemented or modified except in writing signed by Lender and Debtors.

Lender's Expenses: The Debtors shall reimburse the Lender for all reasonable costs and expenses, including legal fees, in connection with the negotiation, documentation,

execution, syndication and delivery of the DIP Loan, and the monitoring and/or participation in the Bankruptcy Case. Lender is authorized to advance an amount equal to such costs and expenses, including legal fees, from the DIP Loan proceeds payable during the week of August 1, 2022 -- the first advance -- upon the dates of entry of the interim DIP Order and Sales Procedures Order.

Notices.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three Business Days after being deposited in the mail, postage prepaid, or one Business Day after being entrusted to a reputable commercial overnight delivery service, or, in the case of electronic mail notice, when sent, addressed as follows in the case of the Debtors and Lender or to such other address as may be hereafter notified by such respective parties hereto:

GetSwift, Inc.
c/o Janice B. Grubin
Barclay Damon LLP
1270 Avenue of the Americas, Suite 501
New York, New York
212 784-7808

With a copy to:
Janice B. Grubin
Barclay Damon LLP
1270 Avenue of the Americas, Suite 501
New York, New York
212 784-7808
jgrubin@barclaydamon.com

GetSwift Technologies Limited

c/o Kyla Mahar

Miller Thomson  LLP

Scotia Plaza

40 King Street West, Suite 5800

P.O. Box 1011

Toronto, Ontario M5H 3S1 Canada

With a copy to:

Kyla Mahar

Miller Thomson  LLP

Scotia Plaza

40 King Street West, Suite 5800

P.O. Box 1011

Toronto, Ontario M5H 3S1 Canada

Galactic Ventures LLC

400 Rella Boulevard Suite 301

Suffern, New York  10901

212 686 1024

bmorgan@galacticlitigation.com

Backenroth Frankel & Krinsky, LLP
800 Third Ave. Fl 11
New York NY  10022
(212) 593-1100
mfrankel@bfklaw.com

    <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or <u>partial</u> exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other

right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Survival of Representations and Warranties.  All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the DIP Loan.

Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

Additional Grant of Lien.  All DIP Obligations, contingent or absolute (including, without limitation, the principal thereof, interest thereon, and any costs and expenses owing in connection therewith) which may now or from time to time hereafter be owing by the Debtors to Lender under any of the DIP Loan Documents shall be secured as set forth in the DIP Order.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

BORROWERS

GetSwift, Inc.

_____

By:_____Joel Macdonald_____

Title: _____President_____

GetSwift Technologies Limited

_____

By: ___Joel Macdonald_____

Title: ___President_____

LENDER

Galactic Ventures LLC

_____

By:_____

Title: _____

LENDER

**Galactic Ventures LLC**

By: R Bruce Morgan
Title: Managing Director

# EXHIBIT 2

GetSwift Inc & GetSwift Technologies Limited
**Consolidated Cash Flow Forecast**

($USD)

| GSW Technologies Ltd | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1-Aug-22 | 8-Aug-22 | 15-Aug-22 | 22-Aug-22 | 29-Aug-22 | 5-Sep-22 | 12-Sep-22 | 19-Sep-22 | 26-Sep-22 | 3-Oct-22 | 10-Oct-22 | 17-Oct-22 | 24-Oct-22 | |
| **Receipts:** | | | | | | | | | | | | | | - |
| **Disbursements:** | | | | | | | | | | | | | | - |
| Vendor Disbursements | | | | | | | | | | | | | | |
| Payroll | | | | | | | | | | | | | | |
| Professional Fees | - | - | - | - | - | - | (10,000) | - | - | - | - | (5,000) | (5,000) | (20,000) |
| Restructuring Fees | | | | | | | (37,500) | - | | | | (37,500) | - | (75,000) |
| **Subtotal: Disbursements** | - | - | - | - | - | - | (47,500) | - | - | - | - | (42,500) | (5,000) | (95,000) |
| **Adjustments:** | | | | | | | | | | | | | | |
| Revenue Discount (20%) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Contingency (10%) | - | - | - | - | - | - | (4,750) | - | - | - | - | (4,250) | (500) | (9,500) |
| **Total Disbursements** | - | - | - | - | - | - | (52,250) | - | - | - | - | (46,750) | (5,500) | (104,500) |
| **Period Cash Flow** | - | - | - | - | - | - | (52,250) | - | - | - | - | (46,750) | (5,500) | (104,500) |
| Beginning Cash | (12,875) | (12,875) | (12,875) | (12,875) | (12,875) | (12,875) | (12,875) | (65,125) | (65,125) | (65,125) | (65,125) | (65,125) | (111,875) | |
| Period Cash Flow | - | - | - | - | - | - | (52,250) | - | - | - | - | (46,750) | (5,500) | |
| Ending Cash | (12,875) | (12,875) | (12,875) | (12,875) | (12,875) | (12,875) | (65,125) | (65,125) | (65,125) | (65,125) | (65,125) | (111,875) | (117,375) | |

| GSW Inc | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1-Aug-22 | 8-Aug-22 | 15-Aug-22 | 22-Aug-22 | 29-Aug-22 | 5-Sep-22 | 12-Sep-22 | 19-Sep-22 | 26-Sep-22 | 3-Oct-22 | 10-Oct-22 | 17-Oct-22 | 24-Oct-22 | |
| **Receipts:** | - | 28,000 | 210,465 | 21,634 | 214,850 | 7,000 | 205,800 | 21,600 | 37,616 | - | 7,000 | 205,800 | 21,600 | 981,364 |
| **Disbursements:** | | | | | | | | | | | | | | |
| Vendor Disbursements | (57,758) | (7,727) | (14,245) | (199,456) | (18,722) | (40,009) | (8,629) | (9,880) | (194,578) | (43,888) | (7,926) | (11,142) | (181,443) | (795,401) |
| Payroll | (48,000) | (5,114) | (53,500) | - | (48,000) | (5,114) | (48,000) | (5,500) | (48,000) | (5,114) | (48,000) | (5,500) | (48,000) | (367,842) |
| Professional Fees | | | | | | | (22,500) | | | | | (22,500) | | (45,000) |
| Restructuring Fees | | | | | | | (95,000) | | | | | (95,000) | | (190,000) |
| **Subtotal: Disbursements** | (105,758) | (12,841) | (67,745) | (199,456) | (66,722) | (45,123) | (174,129) | (15,380) | (242,578) | (49,002) | (55,926) | (134,142) | (229,443) | (1,398,243) |
| **Adjustments:** | | | | | | | | | | | | | | |
| Revenue Discount (20%) | - | (5,600) | (42,093) | (4,327) | (42,970) | (1,400) | (41,160) | (4,320) | (7,523) | - | (1,400) | (41,160) | (4,320) | (196,273) |
| Contingency (10%) | (10,576) | (1,284) | (6,774) | (19,946) | (6,672) | (4,512) | (17,413) | (1,538) | (24,258) | (4,900) | (5,593) | (13,414) | (22,944) | (139,824) |
| **Total Disbursements** | (116,334) | (19,725) | (116,612) | (223,729) | (116,364) | (51,035) | (232,701) | (21,238) | (274,359) | (53,902) | (62,918) | (188,717) | (256,707) | (1,734,340) |
| **Period Cash Flow** | (116,334) | 8,275 | 93,852 | (202,095) | 98,486 | (44,035) | (26,901) | 362 | (236,743) | (53,902) | (55,918) | 17,083 | (235,107) | (752,977) |
| Beginning Cash | 105,812 | (10,522) | (2,246) | 91,606 | (110,489) | (12,004) | (56,039) | (82,940) | (82,578) | (319,321) | (373,223) | (429,141) | (412,058) | |
| Period Cash Flow | (116,334) | 8,275 | 93,852 | (202,095) | 98,486 | (44,035) | (26,901) | 362 | (236,743) | (53,902) | (55,918) | 17,083 | (235,107) | |
| Ending Cash | (10,522) | (2,246) | 91,606 | (110,489) | (12,004) | (56,039) | (82,940) | (82,578) | (319,321) | (373,223) | (429,141) | (412,058) | (647,165) | |

| Total Consolidated | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (Inc & Technologies) | 1-Aug-22 | 8-Aug-22 | 15-Aug-22 | 22-Aug-22 | 29-Aug-22 | 5-Sep-22 | 12-Sep-22 | 19-Sep-22 | 26-Sep-22 | 3-Oct-22 | 10-Oct-22 | 17-Oct-22 | 24-Oct-22 | |
| **Receipts:** | | | | | | | | | | | | | | |
| Operating Receipts | - | 28,000 | 210,465 | 21,634 | 214,850 | 7,000 | 205,800 | 21,600 | 37,616 | - | 7,000 | 205,800 | 21,600 | 981,364 |
| **Disbursements:** | | | | | | | | | | | | | | |
| Vendor Disbursements | (57,758) | (7,727) | (14,245) | (199,456) | (18,722) | (40,009) | (8,629) | (9,880) | (194,578) | (43,888) | (7,926) | (11,142) | (181,443) | (795,401) |
| Payroll | (48,000) | (5,114) | (53,500) | - | (48,000) | (5,114) | (48,000) | (5,500) | (48,000) | (5,114) | (48,000) | (5,500) | (48,000) | (367,842) |
| Professional Fees | - | - | - | - | - | - | (32,500) | - | - | - | - | (27,500) | (5,000) | (65,000) |
| Restructuring Fees | - | - | - | - | - | - | (132,500) | - | - | - | - | (132,500) | - | (265,000) |
| **Subtotal: Disbursements** | (105,758) | (12,841) | (67,745) | (199,456) | (66,722) | (45,123) | (221,629) | (15,380) | (242,578) | (49,002) | (55,926) | (176,642) | (234,443) | (1,493,243) |
| **Adjustments:** | | | | | | | | | | | | | | |
| Revenue Discount (20%) | - | (5,600) | (42,093) | (4,327) | (42,970) | (1,400) | (41,160) | (4,320) | (7,523) | - | (1,400) | (41,160) | (4,320) | (196,273) |
| Contingency (10%) | (10,576) | (1,284) | (6,774) | (19,946) | (6,672) | (4,512) | (22,163) | (1,538) | (24,258) | (4,900) | (5,593) | (17,664) | (23,444) | (149,324) |
| **Total Disbursements** | (116,334) | (19,725) | (116,612) | (223,729) | (116,364) | (51,035) | (284,951) | (21,238) | (274,359) | (53,902) | (62,918) | (235,467) | (262,207) | (1,838,840) |
| **Period Cash Flow** | (116,334) | 8,275 | 93,852 | (202,095) | 98,486 | (44,035) | (79,151) | 362 | (236,743) | (53,902) | (55,918) | (29,667) | (240,607) | (857,477) |
| Beginning Cash | 92,937 | (23,397) | (15,121) | 78,731 | (123,364) | (24,879) | (68,914) | (148,065) | (147,703) | (384,446) | (438,348) | (494,266) | (523,933) | |
| Period Cash Flow | (116,334) | 8,275 | 93,852 | (202,095) | 98,486 | (44,035) | (79,151) | 362 | (236,743) | (53,902) | (55,918) | (29,667) | (240,607) | |
| Ending Cash | (23,397) | (15,121) | 78,731 | (123,364) | (24,879) | (68,914) | (148,065) | (147,703) | (384,446) | (438,348) | (494,266) | (523,933) | (764,540) | |

| DIP Loan Advancement Schedule | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | 92,937 | 51,603 | 59,879 | 153,731 | 51,636 | 150,121 | 106,086 | 51,935 | 52,297 | 65,554 | 61,652 | 55,734 | 101,067 | |
| Period Cash Flow | (116,334) | 8,275 | 93,852 | (202,095) | 98,486 | (44,035) | (79,151) | 362 | (236,743) | (53,902) | (55,918) | (29,667) | (240,607) | |
| DIP Loan Advance | 75,000 | | | 100,000 | | | 25,000 | | 250,000 | 50,000 | 50,000 | 75,000 | 200,000 | |
| Ending Cash | 51,603 | 59,879 | 153,731 | 51,636 | 150,121 | 106,086 | 51,935 | 52,297 | 65,554 | 61,652 | 55,734 | 101,067 | 60,460 | |

| Loan Fees / Costs paid from Principal | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Origination Fee | 15,000 | | | | | | | | | | | | | 15,000 |
| Admin Fee | 5,000 | | | | | | | | | | | | | 5,000 |
| Legal Fees | 25,000 | - | - | - | - | - | - | - | 25,000 | - | - | - | - | 50,000 |
| **Total Loan Fees / Costs** | 45,000 | - | - | - | - | - | - | - | 25,000 | - | - | - | - | 70,000 |