**BARCLAY DAMON LLP**
Janice B. Grubin
Ilan Markus
Scott L. Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone:  (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
In re:                                                        :    Chapter 11, Subchapter V
                                                              :
    GETSWIFT, INC.,                                           :    Case No. 22-11057
                                                              :
                                    Debtor.                   x
------------------------------------------------------------- 
In re:                                                        :    Chapter 11, Subchapter V
                                                              :
    GETSWIFT TECHNOLOGIES LIMITED,                            :    Case No. 22-11058
                                                              :
                                    Debtor.                   x
------------------------------------------------------------- 

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I) (A) APPROVING BID
PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF
THE ASSETS OF GETSWIFT, INC., (B) ESTABLISHING PROCEDURES IN
CONNECTION WITH THE ASSUMPTION OR ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, (C) APPROVING NOTICE PROCEDURES, (D) APPROVING
STALKING HORSE BID PROTECTIONS, AND (E) GRANTING RELATED
RELIEF; AND (II) (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL
OF THE ASSETS OF GETSWIFT, INC., FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE
ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED
THERETO, AND (C) GRANTING RELATED RELIEF**

GetSwift, Inc. ("GSI" or "Seller") and GetSwift Technologies Limited ("GTL"), the above-

captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby move (the

"<u>Motion</u>") pursuant to sections 105(a), 363, and 365 of Title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq*. (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, 6006, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Local Bankruptcy Rules for the

Southern District of New York (the "<u>Local Rules</u>"), for entry of an order, substantially in the form

annexed hereto as **<u>Exhibit A</u>** (the "<u>Bid Procedures Order</u>"):  (a) approving the bid procedures in

the form annexed as **<u>Exhibit 1</u>** to the Bid Procedures Order (as amended or modified, the "<u>Bid</u>

<u>Procedures</u>"), including the designation of a stalking horse bidder, to be implemented in

connection with a sale (the "<u>Sale</u>") of all or substantially all of the assets[1] of GSI (the "<u>Assets</u>");

(b) establishing procedures in connection with the Debtors' assumption or assumption and

assignment to the Successful Bidder or Backup Bidder (as such terms are defined below) of certain

executory contracts and unexpired leases (each an "<u>Assigned Contract</u>" and, collectively, the

"<u>Assigned Contracts</u>") and the allowance of corresponding cure amounts (the "<u>Cure Amounts</u>") to

be paid in connection with such assumption or assumption and assignment; (c) approving the

notice procedures (the "<u>Notice Procedures</u>") to advise parties in interest and Potential Bidders (as

defined below) of the Bid Procedures, the auction of the Assets (the "<u>Auction</u>"), the sale hearing

for the Assets (the "<u>Sale Hearing</u>"), and the Debtors' intent to assume or assume and assign to the

Successful Bidder or Backup Bidder the Assigned Contracts and the alleged amount of the

corresponding Cure Amounts; and (d) granting related relief, including approval of the Bid

Protections (as defined herein) (collectively, the "<u>Bid Procedures Relief</u>").  Additionally, the

Debtors seek entry of an order substantially in the form annexed hereto as **<u>Exhibit B</u>** (the "<u>Sale</u>

<u>Order</u>"):  (a) authorizing the Sale of the Assets, free and clear of liens, claims, encumbrances and

---

[1] The Excluded Assets of GSI that are not part of the Sale include, without limitation, the Logo Call Option and the Kout Food Group Assets including, but not limited to, code and data located on Ireland AWS Stack for the servicing of the Kout Food Group Operation.

other interests, except as provided in the APA (as defined below); (b) approving the assumption

or assumption and assignment of the Assigned Contracts; and (c) granting related relief. In support

of this Motion, the Debtors rely on the *Declaration of Joel Macdonald Pursuant to Local*

*Bankruptcy Rule 1007-2* (the "First Day Declaration"). In further support of this Motion, the

Debtors submit as follows:

### PRELIMINARY STATEMENT

1.      The goal of these Chapter 11 Cases is to consummate a sale of the Debtors' assets

that will maximize recoveries for the Debtors' estates and maintain a viable business. Since April,

2021, GSI has engaged three investment bankers, including Progress Partners, MFS Capital

Advisors, and 333 Capital, who were all retained to market the business for sale, each of whom

engaged in extensive marketing processes. An electronic data room containing GSI's financial

and business information was made available to all prospective purchasers who signed a

nondisclosure agreement. Those marketing efforts resulted in indications of interest from more

than 25 potential purchasers and over 50 different presentations having been made by GSI (with

multiple presentations to some suitors), and led to more than 10 demonstrations of the GetSwift

suite of software to potential purchasers. From these efforts, GSI received three (3) verbal

expressions of interest and five (5) formal offers to purchase the business. The stalking horse

bidder's agreement to serve as the stalking horse bidder (and its investor's agreement to provide

debtor-in-possession financing to fund the sale process and working capital needs pending a sale)

comes at a critical junction following GSI's inability to reach a binding agreement to sell the

business, along with cash flow struggles.

2.      Following two-plus months of negotiations, the Debtors have entered into an APA

with SF2 GSW LLC (the "Stalking Horse Bidder"), an affiliate of Stage Equity Partners, LLC

("Stage"), that would allow the proposed Sale to be subjected to a market test while permitting the Debtors to expeditiously conclude these Chapter 11 Cases. The APA contemplates a purchase price of up to $4.5 million through a combination of cash ($2.5 million) (the "Cash Purchase Price"), an unsecured promissory note ($1 million), and the assumption of certain Assumed Accounts Payable and Cure Costs (up to $1 million).

3.      The Debtors have determined, in their sound business judgment, that the proposed Sale to the Stalking Horse Bidder – subject to higher and better offers pursuant to a fair and open auction process approved by this Court – affords the Debtors the best opportunity to maximize value and is in the best interests of the Debtors and their estates.

4.      The Debtors are also seeking approval of a reasonable bid protection for the Stalking Horse Bidder – a Break-Up Fee equal to 3% of the Cash Purchase Price – without which the Stalking Horse Bidder might not agree to serve in that role, thereby jeopardizing the sale process and in turn, the Debtors' business.

5.      If the Debtors receive competitive offers based on the proposed qualification criteria in the Bidding Procedures, the Debtors intend to conduct an Auction to determine the highest or best offer for the Debtors' assets and would seek approval of the Sale to any such Successful Bidder.

6.      Since the Sale is the only option that will enable the Debtors to preserve the value of their assets, maintain their business operations for the benefit of their customers, and maximize recoveries for the Debtors' estates, the Motion should be granted and the Bid Procedures, Assigned Contract procedures, Notice Procedures, and Bid Protections should be approved, with approval of the Sale to follow.

## JURISDICTION, VENUE AND STATUTORY PREDICATES

7.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014 and the Local Rules.

## BACKGROUND

### A.      The Chapter 11 Case

9.      On August 2, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under subchapter V of chapter 11 the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court") commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     No request for the appointment of a trustee or an examiner has been made in the Chapter 11 Cases and no statutory committees have been appointed or designated.

11.     A description of the Debtors' business operations, corporate structure, pre-petition funding, reasons for commencing these Chapter 11 Cases, and the relief sought from this Court pursuant to the Motion is also set forth in the First Day Declaration.

### B.      The Debtors' Organizational Structure

12.     GetSwift Technologies Limited ("GTL") is the ultimate parent of GetSwift Inc. ("GSI"), a delivery and workforce management software-as-service (SaaS) platform that has been utilized by clients in over 70 countries and across more than 70 different verticals to automate and

manage their local delivery operations and delivery drivers.  The company offers a suite of software, products, and services and focuses on business and logistics automation, and further includes ecommerce and marketplace ordering, workforce management, data analytics and augmentation, business intelligence, route optimization, cash management, task management, shift management, asset tracking, real-time alerts, cloud communications, among others.

13.    GTL was incorporated under the Business Corporations Act (British Columbia) on May 19, 2020.

14.    GTL is a holding company for its operating subsidiaries and has no meaningful operations.  Its principal asset is its listing as a publicly-traded entity in Canada.

15.    GTL's registered address is 250 Howe Street, 20th Floor, Vancouver, BC  V6C 3R8, Canada.  Neither of the Debtors own, lease or hold under other arrangement, real estate from which the Debtors operates their businesses.

16.    GTL directly and wholly owns GetSwift Limited ("GSL"), a non-debtor Australian company incorporated under the Australian Corporations Act.  GTL, which was a public company trading in Australia until early 2021 before it re-domiciled to the NEO Exchange in Canada via a scheme of arrangement, is the 100% owner of GSI, a domestic corporation incorporated under the laws of the State of Delaware with a registered address of 1185 Avenue of the Americas, 3rd Floor, New York, New York 10036.

17.    GTL is a publicly-traded company on the NEO Exchange, trading under the symbol "GSW."  GTL trades on the OTC Pink Sheets under the symbol "GTSWF."

C.    **The Debtors' Business**

18.    GSI serves both "pay-as-you-go" and subscription customers, which consist of small and medium-sized businesses, and "enterprise" customers, which are larger organizations with specific, customized needs over multiple sites.

19.    GSI owns and operates the Delivery Biz Pro ("DBP") and Scheduling Plus ("SP") platforms, along with the getwsift.com platform that it created and developed.

20.    The DBP Platform offers a subscription-based cloud service for business with scheduled, recurring product orders such as produce, meal-kit, farm-to-table, water and other home and commercial deliveries.  The DBP Platform provides delivery providers with software tools to fulfill their customers recurring delivery needs.

21.    The DBP Platform combines business-critical daily functions such as an advanced customer marketplace, intelligent route assignment, customer management, billing, inventory, packing, routing, communications, reporting, procurement, and mobile friendliness.

22.    The SP Platform combines staff scheduling, task management, time and attendance, recordkeeping, and payroll into a single subscription-based cloud solution, which allows business of all sizes to reduce time spent on employee management and optimize their capital.

23.    The GetSwift platform offers a subscription-based cloud service for business with on-demand orders in industries such as food, retail, and florist.  The DBP Platform provides delivery providers with software tools to fulfill their customers on-demand delivery needs.

24.    GSI also operates software development centers around the globe, including one in Belgrade, Serbia.

25.    The authorized capital of GTL consists of an unlimited number of authorized Common Shares, of which 30,764,181 are currently issued and outstanding.

26.     For the three months ended March 31, 2022, the Debtors reported net revenue of approximately $1,001,483 and EBITDA of approximately $623,192.  As of the Petition Date, the Debtors employed approximately 9 employees and 44 independent contractors.

**D.      Pre-Petition Funding of the Debtors' Operations**

27.     Prior to the Petition Date, the Debtors had no borrowing facilities, instead relying on its revenue generation to fund operations.

**E.      Events Leading to Entry into the APA**

***Pre-Petition Marketing Efforts***

28.     In 2018, GSL found itself defending three class action lawsuits (the "Lawsuits") alleging that it had breached its continuous disclosure obligations while publicly listed in Australia. In addition, the Australian Securities and Investment Commission ("ASIC") commenced a proceeding (the "Proceeding") against GSL in February 2019.  The Lawsuits and the Proceeding, which were also brought against certain GSL officers at the time drained a large amount of financial and human resources from the company and ever since, made it difficult for the company to continue its growth trajectory, as well as to attract new clients, investors and capital.

29.     As revenue and margins started to plateau, management began implementing a cost reduction and optimization plan.  In 2021, the company started to explore capitalization options in the form of strategic mergers, acquisitions, and financing.  Also, the company engaged investment bankers and a search for capitalization or a sale of the business was underway.

30.     As noted, since April, 2021, GSI has engaged three investment bankers, including Progress Partners, MFS Capital Advisors, and 333 Capital, to market the business for sale, each of whom engaged in extensive marketing processes.  Those marketing efforts resulted in indications of interest from more than 25 potential purchasers and over 50 different presentations having been

made by GSI (with multiple presentations to some suitors), and led to more than 10 demonstrations

of the GetSwift suite of software to potential purchasers.  From these efforts, GSI received three

(3) verbal expressions of interest and five (5) formal offers to purchase the business.  The Stalking

Horse Bidder's agreement to serve as the stalking horse bidder (and its investor's agreement to

provide debtor-in-possession financing to fund the sale process and working capital needs pending

a sale) comes at a critical junction following GSI's inability to reach a binding agreement to sell

the business, along with cash flow struggles.

31.    In the weeks leading up to the filing of these Chapter 11 Cases, the Debtors

negotiated with the Stalking Horse Bidder regarding a potential stalking horse bid for substantially

all of GSI's assets, and with its investor for a debtor-in-possession loan to help fund the filing of,

and the orderly sale of assets in, these Chapter 11 Cases.

32.    In May 2022, the company announced it signed a Letter of Intent with Stage to

acquire all the software assets of GSI.  Part of the offer was in the form of bridge financing to

ensure the company could continue operationally while it completed the transaction.  At the last

minute, the Stalking Horse Bidder's bridge financing partner pulled out of the financing deal and,

as a result, the Debtors swiftly decided that the path to maximize the stability and value of their

respective business assets was to pursue a sale of substantially all of those assets via a chapter 11

filing.

### Asset Purchase Agreement

33.    Despite the setback, GetSwift was able to reach an agreement with the Stalking

Horse Bidder on the terms of an Asset Purchase Agreement, dated August 2, 2022 (including its

exhibits and schedules, the "APA"), between the Debtors and the Stalking Horse Bidder (the bid

submitted by the Stalking Horse Bidder, the "Stalking Horse Bid"), a Delaware limited liability company.

34.     The APA provides that Stalking Horse Bidder shall purchase the Assets for up to $4.5 million, which includes (i) $2.5 million in cash (plus an Estimated Working Capital Adjustment Amount), (ii) issuance of an unsecured promissory note to Seller in the principal amount of $1 million, and (iii) assumption of up to $1 million in Assumed Accounts Payable and Cure Costs.

35.     As a condition to entering into the APA, the Stalking Horse Bidder required protections (the "Bid Protections") customary in transactions of this nature. Specifically, the APA provides for a break-up fee in the amount of $75,000 (representing 3% of the Cash Purchase Price of $2.5 million, and which is approximately 1.67% of the total purchase price of approximately $4.5 million) (the "Break-Up Fee"), payable to the Stalking Horse Bidder upon consummation of an Alternative Transaction. As set forth below, the Debtors believe that the Bid Protections are reasonable under the circumstances and should be approved.

36.     The APA was negotiated, proposed, and entered into by GTL, GSI and the Stalking Horse Bidder without collusion, in good faith, and from arm's-length bargaining positions. GTL, GSI, and the Stalking Horse Bidder were represented by sophisticated and experienced advisors and attorneys.

**PROPOSED SALE PROCEDURES**

37.     Having negotiated the Stalking Horse Bid, the Debtors desire to proceed toward the solicitation of additional bids and an Auction (if necessary) in accordance with the following

schedule, which is subject to the Court's entry of an order shortening the time to hear that portion

of this motion that seeks approval of the Bidding Procedures:[2]

| Event or Deadline | Date and Time |
|---|---|
| Deadline to Object to Bid Procedures Order | Until the Commencement of the Bid Procedures Hearing |
| Hearing on Bid Procedures Order | On or before August 5, 2022 |
| Deadline to File Notice of Assumption and Assignment | On or before August 15, 2022 |
| Deadline to Object to Cure Amounts, Stalking Horse Adequate Assurance of Future Performance, and Sale (for all objections other than stemming from the identity of the Successful Bidder (if different than the Stalking Horse Bidder)) | On or before September 9, 2022 at 5:00 p.m. (prevailing Eastern Time) |
| Bid Deadline | On or before September 14, 2022 at 5:00 p.m. (prevailing Eastern Time) |
| Deadline to Designate Qualified Bids | On or before September 19, 2022 at 5:00 p.m. (prevailing Eastern Time) |
| Auction (if necessary) | On or before September 22, 2022 at 10:00 a.m. (prevailing Eastern Time) |
| Deadline to File Notice Designating Successful Bidder | One (1) business day following conclusion of the Auction |
| Deadline to Object to Non-Stalking Horse Adequate Assurance of Future Performance and Raise Any Additional Cure Cost Objections (if initial cure objection was filed timely) | Until the commencement of the Sale Hearing |
| Deadline to Object to Sale Based on Identity of Successful Bidder (if different than the Stalking Horse Bidder) | Until the commencement of the Sale Hearing |
| Sale Hearing | On or before September 23, 2022 |
| Deadline to Close on Sale | On or before October 3, 2022 |

---

[2] Contemporaneously herewith, the Debtors are filing a motion to shorten notice on the Bid Procedures Relief aspect of the Sale Motion. As necessary, the Debtors will revise this timeline to be consistent with the Court's rulings.

## RELIEF REQUESTED

38.    By this Motion, the Debtors seek entry of the Bid Procedures Order (a) approving the Bid Procedures and the designation of the Stalking Horse Bidder as stalking horse bidder for the Sale, (b) establishing procedures with respect to the assumption or assumption and assignment of executory contracts and leases, (c) approving the proposed Notice Procedures, and (d) granting related relief, including the Bid Protections. The Debtors believe that entry of the Bid Procedures Order would appropriately balance the need for an expedited resolution with providing a fair opportunity for parties in interest to participate in a sale process.

39.    Further, the Debtors seek entry of the Sale Order (a) authorizing the sale of the Assets, free and clear of all liens, claims, encumbrances and other interests, except as provided in the APA, (b) approving the assumption or assumption and assignment of certain of the Debtors' executory contracts and unexpired leases, and (c) granting relief related relief.

## A.    The Bid Procedures

40.    The Debtors' proposed Bid Procedures are intended to establish a sale process that will maximize the value of the Assets for the benefit of the Debtors' estates and their creditors. The Debtors will solicit bids for the Assets in accordance with the Bid Procedures and, if bids are received in conformance with the Bid Procedures, the Debtors will conduct the Auction to determine the highest or otherwise best bid for the Assets. The following sets forth a summary of the key provisions of the Bid Procedures:[3]

- **Bid Deadline:** Any person or entity wishing to bid on the Assets (a "Potential Bidder") must deliver to Debtors' counsel a written offer (each, a "Written

---

[3] The description of the Bid Procedures includes excerpts from the terms set forth in the Bid Procedures annexed hereto.  Capitalized terms used but not otherwise defined in this section have the meanings ascribed to them in the Bid Procedures.  To the extent that this description differs in any way from the terms set forth in the Bid Procedures, the terms of the Bid Procedures shall control.

Offer") no later than September 14, 2022 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline").

- **Access to Diligence Materials:**  Any party that submits to the Debtors (i) an executed confidentiality agreement in such form reasonably satisfactory to the Debtors, and (ii) reasonable evidence demonstrating the party's financial capability to consummate a Sale as reasonably determined by the Debtors, may be granted access to diligence materials.

- **Requirements for a Qualified Bid:**  To be deemed a "Qualified Bid", a Potential Bidder must make a Written Offer that meets each of the requirements listed below:[4]

  o **Executed Agreement:**  Be accompanied by (i) a clean and duly executed and binding asset purchase agreement (together with the exhibits and schedules thereto, a "Modified APA"), and (ii) a marked Modified APA reflecting any variations from the APA, both of which shall be subject to section 4(xii) of the Bid Procedures.

  o **Designation of Assumed or Assumed and Assigned Contracts and Leases and Adequate Assurance of Future Performance:**  Contain a list of any and all executory contracts and unexpired leases of the Debtors that are to be assumed and assigned in connection with a Sale (each a "Contract" and, collectively, the "Contracts" and once assumed, or assumed and assigned, an "Assigned Contract") to the extent such list is not included in the Modified APA. The Potential Bidder must also include written documentation sufficient to demonstrate the Potential Bidder's ability to provide adequate assurance of future performance for the benefit of the non-debtor parties to the Contracts on the list, including, without limitation, (i) the specific name of the entity to whom the Contract will be assigned; (ii) if available, audited financial statements and annual reports of the proposed purchaser and any other assignee for the past three (3) years, including all supplements or amendments thereto; (iii) cash flow projections for the proposed assignee, the proposed assignee's most recent business plan, and any financial projections, calculations and/or pro formas prepared in contemplation of purchasing the assets, including the Assigned Contacts; (iv) all documents and other evidence of the proposed assignee's experience in the Debtors' industry; and (v) a contact person for the proposed assignee whom non-debtor parties may contact directly in connection with adequate assurance of future performance. Should the Potential Bidder be a newly formed entity (a "Newco"), written evidence of adequate assurance of future performance should also include when such Newco was formed, the relevant financial information of the equity

---

[4] The Stalking Horse Bid and any subsequent bids made by the Stalking Horse Bidder in accordance with the Bid Procedures shall each constitute a Qualified Bid regardless of the requirements of a Qualified Bid set forth in the Bid Procedures.

sponsors of the Newco, how it will be financed together with evidence of firm financial commitments, and identify what credit enhancements, if any, will be available to guarantee the obligations under the Assigned Contracts. Non-debtor parties to the Contracts may object on adequate assurance grounds at or before the Sale Hearing.

o **Proof of Financial Ability to Perform:**  Contain evidence of financing, access to funds or such other financial and other information that will reasonably allow the Debtors to make a determination as to such Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA, which evidence is satisfactory to the Debtors, including, without limitation, such financial and other information setting forth adequate assurance under section 365 of the Bankruptcy Code in a form requested by the Debtors. Should the Potential Bidder be a Newco, such information shall be provided in respect of the Newco's equity sponsors.

o **Identification of Parties to Participate:**  To the Debtors' satisfaction, (i) fully disclose the identity of each entity or person that will be bidding for the Assets or otherwise participating in connection with such bid, (ii) the terms of any such participation, and if an entity has been formed for the purpose of acquiring some, or all, of the Assets, the parties that will bear liability for any breach by such entity, and (iii) the ability of such parties to obtain government, licensing or regulatory approval, if necessary, in connection with the consummation of any Sale.

o **Irrevocable:**  State that the Written Offer is irrevocable until (i) the closing of the Sale, if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Successful Bidder (as defined below), or (ii) if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Backup Bidder (as defined below), until the earlier of (x) two (2) business days after the closing of the transaction(s) by which all of the Assets that were subject to such Backup Bid (as defined below) have been transferred to one or more Qualified Bidders pursuant to these Bid Procedures and (y) sixty (60) days after the date of the Auction (the "Backup Bid Expiration Date").

o **No Break-Up Fee or Expense Reimbursement:**  Not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment; provided, however, that the APA with the Stalking Horse Bidder shall contain a break-up fee and expense reimbursement, as approved in the Bid Procedures Order.

o **Contingencies:**  Not contain any due diligence or financing contingencies.

o **Authorization to Consummate Sale:**  Provide evidence of authorization and approval from the Potential Bidder's board of directors (or comparable

governing body), if any, with respect to the submission, execution, delivery and closing of the Modified APA to the Debtors' satisfaction.

o **Minimum Purchase Price:** Bids must provide for a Purchase Price equal to or greater than the Purchase Price stated in the APA (which is comprised of (A) $2.5 million in cash plus an Estimated Working Capital Adjustment Amount, (B) issuance of an unsecured promissory note to Seller in the principal amount of $1 million, and (C) assumption of up to up to $1 million in Assumed Accounts Payable and Cure Costs, plus (x) the amount of the Break-Up Fee ($75,000), (as defined and set forth in the APA), plus (z) a minimum overbid amount of $50,000.00, which in the aggregate is a minimum overbid amount of approximately $125,000. Any overbids by the Stalking Horse Bidder must clearly identify the components of the bid, including whether, and to what extent, the Stalking Horse Bidder is seeking to "credit bid" the Break-Up Fee.

o **Good Faith Offer:** Constitute a good faith, bona fide offer to purchase all of the Assets.

o **Same or Better Terms:** Be on terms that, in their totality, are determined by the Debtors, in their business judgment, to be the same or better than the terms set forth in the APA in their totality.

o **Good Faith Deposit:** Provide a good faith deposit (the "Good Faith Deposit") submitted via federal wire transfer in immediately available funds in accordance with the wire instructions to be provided by the Debtors, or such other form as is acceptable to the Debtors, in an amount equal to 10% of the cash purchase price set forth in the Written Offer.

o **Anticipated Timeline:** Set forth the anticipated timeframe for (i) obtaining any required government, regulatory or other approvals, and (ii) consummating the Sale within the requirements of subparagraph (xvii) of the Bid Procedures.

o **Agreement with Bid Procedures, Provision of Additional Information and Submission to Bankruptcy Court Jurisdiction**: Include a written acknowledgement by such Potential Bidder that it (i) agrees to the terms of the Bid Procedures; (ii) agrees to provide such other information as may be reasonably requested in writing by the Debtors prior to the Auction; and (iii) confirms that the Potential Bidder submits to the jurisdiction of the Court.

o **As-Is, Where-Is:** Include a disclaimer acknowledging that the Sale will be conducted on an As-Is, Where-Is Basis in accordance with section 8 of the Bid Procedures.

o **Closing Date:** Provide for a closing date (the "Closing Date") as set forth in section 1.7 of the APA (at 10:00 a.m. local time on the second business

day following the satisfaction or waiver of the conditions set forth in Article VI, or at such other place and time as the parties may otherwise agree).

- **Auction:** Prior to the Auction, the Debtors shall identify the highest and best of the Qualified Bids received (the "Opening Qualified Bid"). Subsequent bidding will continue in minimum increments valued at not less than $50,000 cash or in such amounts as to be determined by the Debtors, with the consent of the Stalking Horse Bidder, prior to, and announced at, the Auction. Each Qualified Bidder (other than the Stalking Horse Bidder) shall provide evidence of its financial wherewithal and ability to consummate the Sale at the increased Purchase Price. Any overbids by the Stalking Horse Bidder must clearly identify the components of the bid, including whether, and to what extent, the Stalking Horse Bidder is seeking to "credit bid" the Break-Up Fee. Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable, (i) identify and determine in their business judgment the highest and best Qualified Bid for the Assets (a "Successful Bid") and the entity or entities submitting such Successful Bid (the "Successful Bidder"), (ii) advise the Qualified Bidders of such determination, (iii) require the Successful Bidder to deliver an executed Final APA, which reflects its bid and any other modifications submitted and agreed to during the Auction, prior to commencement of the Sale Hearing, and (iv) file with the Court a designation of Successful Bidder.

41.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids.

42.     As part of the Bid Procedures, the Debtors also seek court approval for the Stalking Horse Bidder to serve as stalking horse bidder for the Sale under the terms proposed in the APA.

**B.     Assumption and Assignment/Cure Procedures**

43.     To facilitate and effectuate the Sale, the Debtors may be required to assume or assume and assign certain Assigned Contracts to the Successful Bidder or Backup Bidder, as applicable. Given the number of executory contracts to which the Debtors are a party, the Debtors seek to establish (a) procedures for determining Cure Amounts through the closing date of the Sale, which amounts shall include all pre- and post-petition amounts the Debtors owe the non-debtor party under each Assigned Contract that have accrued and not been paid prior to the closing

date, and (b) a deadline for any other objections to the assumption or assumption and assignment

of the Assigned Contracts, including, without limitation, adequate assurance of future performance

(collectively, the "Cure Procedures").

44.    The Stalking Horse Bidder intends to have the Debtors assume and assign the

contract of Eplexity – an Amazon Web Services (AWS) premier partner that manages GSI's cloud

environments continuously by a 100% AWS Certified operations team – which the Stalking Horse

Bidder (and likely any other Successful Bidder) deems vital to its acquisition of the business.  In

fact, the APA specifically provides for the assumption and assignment of the Eplexity contract to

the Stalking Horse Bidder.

45.    By August 15, 2022, the Debtors shall distribute to non-debtor parties to the

Assigned Contracts a notice, substantially in the form annexed to the Bidding Procedures Order as

**Exhibit 3** (the "Notice of Assumption or Assignment and Assumption"), listing (i) the potential

Assigned Contract(s); and (ii) the Cure Amount(s), if any.

46.    To facilitate a prompt resolution of cure disputes and objections relating to the

assumption or assumption and assignment of the Assigned Contracts, the Debtors propose the

following deadlines and procedures:

     a.     Unless the non-debtor party to an Assigned Contract files an objection (the "Contract Objection") to (a) their scheduled Cure Amount and/or (b) to the proposed assumption and assignment of such Assigned Contract to the Stalking Horse Bidder by (i) **5:00 p.m. (prevailing Eastern Time) on September 9, 2022**, then such non-debtor party (i) will be forever barred and estopped from objecting to the Cure Amount, and the Debtors, the Successful Bidder or Backup Bidder, as applicable, shall be entitled to rely solely upon the Cure Amount, and (ii) if the Assigned Contract is identified as being assumed or assumed and assigned to the Stalking Horse Bidder (in the event they are the Successful Bidder or Backup Bidder) in connection with the Sale, will be deemed to have consented to the assumption or assumption and assignment of such Assigned Contract to the Stalking Horse Bidder or its designee and will be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or the

Backup Bidder, as applicable, or any other designee of the relevant Assigned Contract that any additional amounts are due or defaults exist, or conditions to assumption or assumption and assignment must be satisfied, under such Assigned Contract.

b.      If any non-debtor party to an Assigned Contract, through a Contract Objection, challenges a Cure Amount (or asserts any other objection to assumption or assumption and assignment of an Assigned Contract to the Stalking Horse Bidder or its designee), the Contract Objection must set forth the Cure Amount being claimed by the objecting party with appropriate documentation in support thereof, and specify (with appropriate supporting documentation) the factual and legal basis for any other objection. Upon receipt of a timely filed Contract Objection, the Debtors, with the consent of the Successful Bidder or Backup Bidder, as applicable, are authorized, but not directed, to resolve any Contract Objection by mutual agreement with the objecting counterparty to any Assigned Contract without further order of the Court. In the event that the Debtors and any objecting party are unable to resolve consensually any timely filed Contract Objection, the Court will resolve any such Contract Objection at the Sale Hearing or at such other hearing set by this Court.

c.      Within one (1) business day after the conclusion of the Auction, the Debtors will serve a notice identifying the Successful Bidder and Backup Bidder to the non-debtor parties to the Assigned Contracts that have been identified in such Successful Bid and Backup Bid. The non-debtor parties to such Assigned Contracts will have until the commencement of the Sale Hearing (the "Adequate Assurance and Supplemental Cure Objection Deadline") to object to the assumption or assumption and assignment of such Assigned Contract solely on the issues of (i) whether the Successful Bidder or Backup Bidder, as applicable, can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, and (ii) any alleged change to the Cure Amount between the filing of an initial, timely filed Contract Objection and the Sale Hearing.

d.      Notwithstanding anything to the contrary contained in this Bid Procedures Order, the Debtors, and the Successful Bidder or Backup Bidder, as applicable, may determine to exclude any Assigned Contract from the Sale upon written notice to any such non-debtor counterparties.

## C.    Notice Procedures

47.      The Debtors request that the Court approve the following Notice Procedures in connection with providing all parties in interest and Potential Bidders with notice of the Bid Procedures, the Auction, the Sale Hearing, and the Debtors' intent to assume or assume and assign

to the Successful Bidder or Backup Bidder the Assigned Contracts and the corresponding Cure

Amounts as follows:

a. On or before three (3) business days after entry of this Bid Procedures Order, or as soon as practicable after such parties can be identified, the Debtors will cause (a) a notice in substantially the form annexed hereto as **Exhibit 2** (the "Notice of Bid Procedures, Auction Date and Sale Hearing") and (b) a copy of the Bid Procedures Order to be sent by first-class mail, postage prepaid, to the following: (i) the Office of the United States Trustee; (ii) the Subchapter V Trustee; (iii) the Stalking Horse Bidder; (iv) the Lender; (v) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (vi) all persons known or reasonably believed by the Debtors to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon any of the Assets; (vii) the non-debtor parties to the Assigned Contracts; (viii) all persons known or reasonably believed to have expressed an interest in acquiring the Assets within the last six (6) months; (ix) all taxing authorities in the states where the Debtors are located, including the Internal Revenue Service, and all other federal, state and local taxing and regulatory authorities known to the Debtors to assert jurisdiction over the Debtors or which are reasonably expected by the Debtors to have claims, contingent or otherwise, in connection with the ownership of the Assets, or to have any known interest in the relief requested by the Motion; (x) all parties to any litigation involving the Debtors; and (xi) any other persons reasonably requested to be noticed by the Stalking Horse Bidder.

b. On or before three (3) business days after entry of the Bid Procedures Order, the Debtors will serve the Notice of Bid Procedures, Auction Date and Sale Hearing on all known creditors of the Debtors.

c. By August 15, 2022, the Debtors shall serve, by first class mail or hand delivery, a notice, substantially in the form attached hereto as **Exhibit 3**, of the potential assumption or assumption and assignment of the Assigned Contracts (the "Notice of Assumption or Assumption and Assignment") on all non-debtor parties to the Assigned Contracts. The Notice of Assumption or Assumption and Assignment (or a Supplemental Notice of Assumption or Assumption and Assignment (defined below)) shall (i) identify the amount of the Cure Amounts that the Debtors believe must be paid to cure all prepetition defaults under the Assigned Contracts, and (ii) provide instructions for the timing and procedure governing the filing of any objections to (a) the proposed Cure Amounts and (b) the proposed assumption or assumption and assignment of any Assigned Contract in connection with the Sale, as approved by the Court in the Bid Procedures Order. In addition, if the Debtors identify additional executory contracts or unexpired leases that might be assumed by the Debtors or assumed by the Debtors and assigned to the Successful Bidder or Backup Bidder, as applicable, that are not included in the original Notice of Assumption or Assumption and Assignment, the Debtors shall promptly send a supplemental

notice (a "<u>Supplemental Notice of Assumption or Assumption and Assignment</u>") to any such applicable counterparties to such additional Assigned Contracts.

d.   On or before seven (7) days after entry of this Bid Procedures Order, subject to applicable submission deadlines, the Debtors will publish an abbreviated version of the Notice of Bid Procedures, Auction Date and Sale Hearing in one or more regional and/or national publications that the Debtors, in their business judgment, deem appropriate.

e.   In addition to the foregoing, electronic notification of the Motion, the Bid Procedures Order, the Notice of Bid Procedures, Auction Date and Sale Hearing, and the Notice of Assumption or Assumption and Assignment, will be posted on the main case docket on the Court's electronic case filing (ECF) website.

## D.   <u>Extraordinary Provisions Under Local Guidelines</u>

48.    The proposed Bid Procedures and APA contain the following "Extraordinary Provisions" as described in the Guidelines for the Conduct of Asset Sales, adopted by General Order M-331, other than a waiver of the stay provided by section 6004:

- GSI's CEO, Joel Macdonald, received an offer from the Stalking Horse Bidder, if the Stalking Horse Bidder is the successful bidder at auction and if it closes on that potential purchase, to advise the Stalking Horse Bidder with respect GSI's business. Mr. Macdonald has not yet accepted that offer. Although GSI is aware that the Stalking Horse Bidder is interested in hiring some or all of the Employees if it is purchases the Assets, GSI is not aware of any discussions or agreement between the Stalking Horse Bidder and management or any key employees, apart from Joel Mcdonald. §I.D.2 and §I.D.6.

- The Debtors will retain, or have reasonable access to, their books and records to enable the Debtors to administer the Chapter 11 Cases. *See* Guidelines for the Conduct of Sale, §I.D.9.

- The proposed Sale Order contains findings concerning successor liability. The Debtors submit such findings are appropriate in light of the notice that will be provided as set forth herein. *See* Guidelines for the Conduct of Sale, §I.D.12; Sale Order, ¶¶ T, 18.

- The Sale Motion requests relief under Bankruptcy Rule 6004(h) of the 14-day stay of the order. *See* Guidelines for the Conduct of Sale, §I.D.16.

For the reasons set forth herein and as the evidence at the Sale Hearing will establish, the Debtors

submit that each of the foregoing provisions in the proposed Sale Order should be approved.

## BASIS FOR RELIEF REQUESTED

**A.    The Sale and the Bid Procedures Should Be Approved Based on the Sound Business Judgment of the Debtor**

49.    Ample authority exists for approval of the Bid Procedures and Sale contemplated

by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property

of the estate." 11 U.S.C. § 363(b)(1). Courts in the Second Circuit and others, in applying this

section, have required that the sale of a debtor's assets be based upon the sound business judgment

of the debtor. *See Official Comm. of Unsecured Creditors of LTV Aerospace Def. Co., v. LTV*

*Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a

section 363(b) application must find from the evidence presented a good business reason to grant

such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d

1063, 1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.,* 407 B.R. 463, 493-94 (Bankr.

S.D.N.Y. 2009), *aff'd sub nom. In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010), and

*aff'd sub nom. In re Motors Liquidation Co.*, 430 B.R. 65 (S.D.N.Y. 2010), *and enforcement*

*denied sub nom. In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), *aff'd in part,*

*vacated in part, rev'd in part sub nom. In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir.

2016), *and aff'd in part, vacated in part*, No. 15-CV-8432 (JMF), 2018 WL 2416567 (S.D.N.Y.

May 29, 2018), *and enforced sub nom. In re Motors Liquidation Co.*, 576 B.R. 313 (Bankr.

S.D.N.Y. 2017), aff'd, No. 15-CV-8432 (JMF), 2018 WL 2416567 (S.D.N.Y. May 29, 2018), *and*

*enforced sub nom. In re Motors Liquidation Co.*, No. 09-50026 (MG), 2018 WL 1801234 (Bankr.

S.D.N.Y. Apr. 13, 2018), *and enforcement granted in part sub nom. In re Motors Liquidation Co.,*

585 B.R. 708 (Bankr. S.D.N.Y. 2018). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *In re Gen. Motors Corp.,* 407 B.R. at 493-94*; Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Sch.)*, 1997 WL188127, *4 (S.D.N.Y. Apr. 17, 1997).

1.      ***The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale***

50.      A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997)) (recognizing that paramount goal of any proposed sale of property of estate is to maximize value).

51.      As set forth above, a clear business justification exists for the sale of the Assets as described herein. An orderly but expeditious sale of Assets is critical to both preserving and realizing the Debtors' going-concern value and maximizing recoveries for the Debtors' economic stakeholders. The proposed Stalking Horse Bid provides for satisfaction of a significant percentage of the Debtors' liabilities, as well as payment of cure claims and assumption of certain other liabilities. The proposed Stalking Horse Bid is the culmination of more than a year of negotiations and exploring strategic alternatives for the Debtors. Pursuit of the sale process will subject the Stalking Horse Bid to higher and better offers and ensure that value for the Debtors' estates is preserved and maximized.

2.      *The Debtors Will Provide Adequate and Reasonable Notice of the Sale
        Transaction*

52.     As set forth more fully herein, the notice provisions of the Bid Procedures and Bid

Procedures Order are reasonable and adequate. The Notice of Bid Procedures, Auction Date and

Sale Hearing will be served in a manner that provides approximately six (6) weeks' notice prior to

the Sale Hearing. Accordingly, the Debtors submit that the Notice of Bid Procedures, Auction Date

and Sale Hearing will provide adequate notice of the Sale by the time of service thereof.

3.      *The Sale Transaction will Produce a Fair and Reasonable Purchase
        Price for the Assets.*

53.     The Debtors also believe that the proposed Bid Procedures are reasonably designed

to enable the Debtors to generate the highest value for the Assets. The proposed Bid Procedures

present a controlled, fair and open process that the Debtors believe will encourage bidding only

from seriously interested parties who possess the financial and operational capacity to purchase

the Assets. As such, the Bid Procedures are designed to promote the paramount goal of any

proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by

the estate. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re

Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools

to encourage bidding and to maximize the value of the debtor's assets"). Courts uniformly

recognize that procedures established for the purpose of enhancing competitive bidding are

consistent with the fundamental goal of maximizing value of a debtor's estate. *See In re Integrated

Res. Inc.*, 147 B.R. at 659 (observing that bid procedures "encourage bidding" and "maximize the

value of the debtor's assets.").

4.      **The Bid Procedures Ensure that the Sale Will Be Consummated in Good
        Faith**

54.      Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest

in property purchased from a debtor notwithstanding that the sale conducted under section 363(b)

of the Bankruptcy Code is later reversed or modified on appeal. Specifically, section 363(m) of

the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under [section
> 363(b)] ... does not affect the validity of a sale ... to an entity that purchased
> ... such property in good faith, whether or not such entity knew of the
> pendency of the appeal, unless such authorization and such sale ... were
> stayed pending appeal.

11 U.S.C. § 363(m).

55.      Section 363(m) of the Bankruptcy Code fosters the "'policy of not only affording

finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders

and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.)*,

1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa.*,

Inc., 788 F.2d 143, 147 (3d Cir. 1986)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888

(S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be

affected by the reversal or modification on appeal of an unstayed order, whether or not the

transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr.

S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the

reversal of a sale on appeal unless there is a stay pending appeal"). The Second Circuit has held

that a purchaser's good faith is shown by the integrity of his or her conduct during the course of

the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may

not be made. *See, e.g., Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d

Cir. 1997) (holding that a purchaser's good faith is lost by "fraud, collusion between the purchaser

and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders")
(internal citations submitted).

56.     The APA was negotiated in good faith and at arm's length between the Debtors and
the Stalking Horse Bidder. The Bid Procedures are designed to produce a fair, transparent, and
competitive bidding process. Like the APA, any asset purchase agreement with a non-stalking
horse Successful Bidder executed by the Debtors will be negotiated at arms' length and in good
faith. All parties in interest will have an opportunity to evaluate and object, if necessary, to any
particular party's conduct or the satisfaction of the requirements of section 363(m) of the
Bankruptcy Code. Accordingly, the Debtors seek a finding that any successful Bidder (including
the Stalking Horse Bidder if named the Successful Bidder) is a good faith purchaser entitled to the
full protections afforded by section 363(m) of the Bankruptcy Code.

57.     For all of these reasons, the proposed Bid Procedures are reasonable, appropriate
and within the Debtors' sound business judgment. They provide the Debtors with the best method
for obtaining the maximum realizable value for the Assets. Thus, the Bid Procedures should be
approved.

**B.     <u>The Proposed Bid Protections are Reasonable and Appropriate and Should
be Approved</u>**

58.     The Debtors also seek authority to offer a customary bid protection by agreeing to
pay the Break-Up Fee to the Stalking Horse Bidder as an allowed administrative-expense priority
claim in the event the Debtors consummate an Alternative Transaction, which the Debtors will
take in to account when evaluating bids, including a possible "credit bid" of the Break-Up Fee by
the Stalking Horse Bidder as part of an additional bid. The use of a stalking horse in a public
auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice
in a chapter 11 case, as the use of a stalking-horse bid is, in many circumstances, the best way to

maximize value in an auction process by "establish[ing] a framework for competitive bidding and

facilitat[ing] a realization of that value." *Official Committee of Unsecured Creditors v. Interforum*

*Holding LLC*, 2011 U.S. Dist. LEXIS 73421, No. 11-CV-219, *4-5, n.1 (E.D. Wis., July 7, 2011).

As a result, a stalking horse bidders virtually always require break-up fees and, in many cases,

other forms of bidding protections as an inducement for "setting the floor at auction, exposing

[their] bid to competing bidders, and providing other bidders with access to the due diligence

necessary to enter into an asset purchase agreement." *Id.* at *5, n.1 (internal citations omitted).

Thus, the use of bidding protections has become an established practice in chapter 11 cases.

59.    Indeed, break-up fees are a normal and, in many cases, necessary component of

significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are

important tools to encourage bidding and to maximize the value of the debtor's assets.... In fact,

because the ... corporation has a duty to encourage bidding, break-up fees can be necessary to

discharge [such] duties to maximize value." *In re Integrated Res., Inc.*, 147 B.R. at 650 (emphasis

added).

60.    The Debtors believe that the allowance of the Break-Up Fee as a bid protection –

which represents a small portion of the Cash Purchase Price (3%) and an even smaller portion of

the total consideration (1.67%) – is in the best interests of the Debtors' estates and their creditors,

as the Stalking Horse Bid will establish a floor for further bidding that may increase the

consideration given for the Assets. Here, the Bid Protections are critical components of the

Stalking Horse Bidder's commitment. The Stalking Horse Bidder has expended time and resources

negotiating, drafting, and performing due diligence activities, despite the fact that its bid will be

subject not only to Court approval, but also to overbidding by third parties. The parties negotiated

the requested Break-Up Fee in good faith and at arm's-length with significant give-and-take with

respect to proposed Bid Protections. As a result, by agreeing to the Bid Protections, the Debtors

ensured that their estates would have the benefit of the transactions with the Stalking Horse Bidder

without sacrificing the potential for interested parties to submit overbids at the Auction.

61.     If the Court does not approve the Bid Protections, the Stalking Horse Bidder may

elect not to serve as the stalking horse, to the detriment of the Debtors' estates. Further, if the Bid

Protections were to be paid, it will likely be because the Debtors received higher or otherwise

superior offers for the Assets. In short, the proposed Bid Protections are fair and reasonable under

the circumstances because the Break-Up Fee constitutes a "fair and reasonable percentage of the

proposed purchase price" and is "reasonably related to the risk, effort, and expenses of the

prospective purchaser." *In re Integrated Res., Inc.*, 147 B.R. at 662 (quoting *In re 995 Fifth Ave.

Associates, L. P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)). Accordingly, the Bid Protections should

be approved.

**C.      The Cure Procedures in Connection with the Potential Assumption or
         Assumption and Assignment of Assigned Contracts are Reasonable and
         Appropriate**

62.     The Debtors believe that the proposed Cure Procedures in connection with the

potential assumption or assumption and assignment of Assigned Contracts are appropriate and

reasonably calculated to provide all non-debtor parties to the Assigned Contracts with timely and

proper notice of the Debtors' intent to assume or assume and assign the Assigned Contracts. The

Cure Procedures provide the non-debtor counterparties with an opportunity to challenge the

assumption or assumption and assignment of such Assigned Contracts either as to the proposed

Cure Amount or as to the assumption and assignment, in general. Therefore, the Debtors

respectfully request the Court approve the proposed Cure Procedures.

**D.**     <u>**The Notice Procedures are Reasonable and Appropriate**</u>

63.     The Debtors believe that the proposed Notice Procedures are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Bid Procedures to be employed in connection therewith, and the Sale Hearing.

64.     The Debtors further believe that the Notice of Assumption or Assumption and Assignment is reasonably calculated to provide all counterparties to the Assigned Contracts with proper notice of the potential assumption or assumption and assignment of the applicable Assigned Contract and any Cure Amount relating thereto.

65.     The Debtors submit that the proposed Notice Procedures comply with Bankruptcy Rule 2002 and the Local Bankruptcy Rules. Therefore, the Debtors believe that the Notice Procedures are reasonable, appropriate and should be approved.

**E.**     <u>**The Sale of the Assets Free and Clear of Liens and Other Interests Is Authorized by Section 363(f) of the Bankruptcy Code**</u>

66.     The Debtors further submit that it is appropriate to sell the Assets free and clear of liens, claims, interests and other encumbrances pursuant to section 363(f) of the Bankruptcy Code, with any such liens, claims, interests or other encumbrances attaching to the cash proceeds of the Assets to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

67.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive and holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

68.     One or more of the subsections of section 363(f) are satisfied with respect to the transfer of the Assets pursuant to the APA.  Pursuant to subsection (1), applicable nonbankruptcy law permits the sale of GSI's property free and clear of liens, claims, interests or encumbrances, due to the absence of any known, valid liens, claims, interests or encumbrances.  To the extent anyone challenges that right, such interest is in bona fide dispute.  For example, GSI expects that its previous CEO may attempt to claim a lien, claim, interest or encumbrance in certain intellectual property assets that are included as part of the proposed Sale.  If so, those alleged liens, claims, interests and/or encumbrances are and will be subject to a bona fide dispute.

69.     A debtor-in-possession may sell property under § 363(b) free and clear of any interest in the property if such interest is in bona fide dispute. *See* 11 U.S.C. § 363(f)(4).  "The purpose of § 363(f)(4) is to permit property of the estate to be sold free and clear of interests that are disputed by the estate 'so that liquidation of the estate's assets need not be delayed while such disputes are being litigated.'" *TransUnion Risk & Alternative Data Sols., Inc. v Best One, Inc. (In*

re TLFO, LLC), 572 BR 391, 435-436 (Bankr S.D. Fla. 2016) ("[t]he evidence admitted at Trial

and discussed in detail above shows that at the time of the sale, [the debtor] owned the BOLT IP.

At the very least, however, there was a bona fide dispute as to who owned the BOLT IP.

Accordingly, pursuant to § 363(f)(4), [the debtor] was authorized to sell the BOLT IP free and

clear of Poulsen's purported interest in the BOLT IP as part of its § 363(b) sale"), quoting In re

Gulf States Steel, Inc. of Ala., 285 B.R. 497, 507 (Bankr. N.D. Ala. 2002) quoting In re Clark, 266

B.R. 163, 171 (9th Cir. BAP 2001). "Section 363(f)(4) does not contemplate or require that the

court resolve or determine any dispute about ownership before a sale hearing, but rather requires

only an examination of whether there is an objective basis for either a factual or legal dispute about

ownership." In re Genesys Research Inst., Inc., No. 15-12794-JNF, 2016 Bankr. LEXIS 2376,

2016 WL 3583229, at *20 (Bankr. D. Mass. June 24, 2016); see also, In re MMH Auto. Grp., LLC,

385 B.R. at 370.

70.      "The authority to sell free and clear is broad because it reflects a compelling policy

intended by Congress in § 363. [T]he purpose behind the free and clear language is to maximize

the value of the asset, and thus enhance the payout made to creditors. Without free and clear

language, prospective buyers would be unwilling to pay a fair price for the property subject to sale;

instead, the price would have to be discounted, perhaps quite substantially, to account for the

liabilities that the buyer would face simply as a result of acquiring the asset." In re Mundy Ranch,

Inc., 484 BR 416, 422-23 (Bankr. D.N.M. 2012), quoting In re Medical Software Solutions, 286

B.R. 431, 446-47 (Bankr. D.Utah 2002).

71.      Based upon the evidence presented and argument to be made at the Sale Hearing,

the Debtors will seek entry of an order authorizing the sale of the Assets free and clear of any liens,

claims, interests and encumbrances.

**F.    Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

72.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir.1993).

73.    The assumption or assumption and assignment of the Assigned Contracts is an exercise of the Debtors' sound business judgment because the assumption or transfer of the Assigned Contracts is necessary to obtain the best value for the Assets. Given that consummation of the Sale is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption or assumption and assignment of the Assigned Contracts is an exercise of sound business judgment and should be approved.

74.    The consummation of the sale, which will involve the assumption or assumption and assignment of the Assigned Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtors propose to file with the Court, and serve on each non-debtor party to an Assigned Contract, a Notice of Assumption or Assumption and Assignment indicating the Debtors' calculation of the Cure Cost for each such contract. Non-debtor parties to the Assigned Contracts will have the opportunity to file objections to the proposed assumption or assumption

and assignment of the Assigned Contracts to the Successful Bidder, including the proposed Cure

Costs.

75.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an

executory contract or unexpired lease of nonresidential real property if "adequate assurance of

future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B).

The meaning of "adequate assurance of future performance" depends on the facts and

circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle*

*Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988)

(citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean absolute assurance that debtor will thrive

and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably

short of an absolute guarantee of performance."). Among other things, adequate assurance may be

given by demonstrating the assignee's financial health and experience in managing the type of

enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 60506 (Bankr. S.D.N.Y.

1986) (adequate assurance of future performance is present when prospective assignee of lease has

financial resources and expressed willingness to devote sufficient funding to business to give it

strong likelihood of succeeding).

76.     As set forth in the Bid Procedures, for a bid to constitute a "Qualified Bid," a

Potential Bidder must include with its bid adequate assurance information regarding its ability (and

the ability of its designated assignee, if applicable) to perform under the Assigned Contracts. The

Debtors will provide adequate assurance information to all counterparties to the Assigned

Contracts and counterparties will have an opportunity to file an objection on adequate assurance

grounds in advance of the Sale Hearing. Based on the foregoing, the Debtors' assumption or

assumption and assignment of the Assigned Contracts satisfies the requirements under section 365

of the Bankruptcy Code and should be approved.

77.    In addition, to facilitate the assumption or assumption and assignment of the

Assigned Contracts, the Debtors further request that the Court find that all anti-assignment

provisions in the Assigned Contracts, whether such provisions expressly prohibit or have the effect

of restricting or limiting assignment of such contract or lease, to be unenforceable under section

365(f) of the Bankruptcy Code.[5]

### G.    The Successful Bidder Should Be Entitled to the Protections of a Good Faith Purchaser Under Section 363(m)

78.    Section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

79.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal.

80.    As set forth more fully herein, the APA was negotiated in good faith and at arm's-

length. Similarly, the selection of the Successful Bidder will be the product of arm's length, good

faith negotiations between the Debtors and the various bidders and other parties in interest. As

---

[5] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts or conditions the assignment of such contract or lease, the trustee may assign such contract or lease[.]"    11 U.S.C. § 365(f)(1).    Section 365(f)(3) further provide that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies or permits a party other than the debtor to terminate, modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."    11 U.S.C. §365(f)(3).

such, the Debtors intend to request a finding that the Successful Bidder is a good faith purchaser

entitled to the protections of section 363(m) of the Bankruptcy Code. A finding of this nature will

protect the Successful Bidder in the event of an appeal, thereby making the sale process more

attractive to prospective bidders.

81.     Moreover, neither the Debtors nor the Stalking Horse Bidder have engaged in any

conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy

Code. The Bid Procedures are designed to prevent the Debtors or the Successful Bidder (or the

Backup Bidder as defined in the Bid Procedures) from engaging in any conduct that would cause

or permit the Sale to the Successful Bidder (or the Backup Bidder) pursuant thereto and hereto, to

be avoided under section 363(n) of the Bankruptcy Code.

### H.     A Waiver of the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

82.     In order to facilitate the prompt disposition of the Assets, a waiver of the provisions

of Bankruptcy Rules 6004(h) and 6006(d) is appropriate. Bankruptcy Rule 6004(h) provides that

an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days

after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d)

provides that an "order authorizing the trustee to assign an executory contract or unexpired lease .

. . is stayed until the expiration of 14 days after the entry of the order, unless the court orders

otherwise." The Debtors request that the Order be effective immediately by providing that the

fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

83.     The waiver of these provisions will result in a more rapid closing of the Sale,

thereby providing greater certainty to prospective bidders, decreasing the expense of the Sale

process, and allowing the Debtors to more expeditiously conclude these Chapter 11 Cases,

especially as cases under subchapter V. Accordingly, a waiver of these provisions is appropriate.

## NOTICE

84.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee; (ii) the Subchapter V Trustee; (iii) the Stalking Horse Bidder; (iv) the Lender; (v) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (vi) all persons known or reasonably believed by the Debtors to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon any of the Assets; (vii) the non-debtor parties to the Assigned Contracts; (viii) all persons known or reasonably believed to have expressed an interest in acquiring the Assets within the last six (6) months; (ix) all taxing authorities in the states where the Debtors are located, including the Internal Revenue Service, and all other federal, state and local taxing and regulatory authorities known to the Debtors to assert jurisdiction over the Debtors or which are reasonably expected by the Debtors to have claims, contingent or otherwise, in connection with the ownership of the Assets, or to have any known interest in the relief requested by the Motion; and (x) all parties to any litigation involving the Debtors. In light of the nature of the relief requested herein and the potential harm to the Debtors' estates if the relief requested herein is not granted, the Debtors respectfully submit that no other or further notice need be provided.

## NO PRIOR REQUEST

85.    No previous application for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request that this Court enter orders granting the

relief requested herein and granting such other and further relief as is just and proper.

Dated:    August 2, 2022
          New York, New York

                              Respectfully submitted,

                              **BARCLAY DAMON LLP**

                              By:  ___/s/Janice B. Grubin_____
                              Janice B. Grubin
                              Ilan Markus
                              Scott L. Fleischer
                              1270 Avenue of the Americas, Suite 501
                              New York, New York 10020
                              Tel.: (212) 784-5800
                              jgrubin@barclaydamon.com
                              imarkus@barclaydamon.com
                              sfleischer@barclaydamon.com

                              *Proposed Counsel to Debtors and*
                              *Debtors-in-Possession*