*Execution Version*

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**, dated as of September 19, 2022 (this "**Agreement**"), among [_____], a [_____][1] (the "**Buyer**"), **GETSWIFT, INC.**, a Delaware corporation (the "**Seller**"), and **GETSWIFT TECHNOLOGIES LIMITED**, a British Columbia corporation ("**Ultimate Parent**" and together with the Seller, the "**Selling Parties**").

## RECITALS

A.    **GETSWIFT TECHNOLOGIES LIMITED, (**the "**Ultimate Parent")**, a Canadian technology and services company, owns 100% of the issued and outstanding capital stock of GETSWIFT LIMITED (the "**Parent**"), which owns 100% of the issued and outstanding capital stock of Seller.

B.    The Seller is engaged in the business of developing and distributing services in connection with the GetSwift SaaS platform, the Scheduling Plus SaaS platform and the Delivery Biz Pro SaaS platform, as further described at https://www.getswift.co (collectively, the "**Business**").

C.    The Seller wishes to sell to the Buyer, and the Buyer wishes to purchase from the Seller, the Business, and in connection therewith the Buyer is willing to assume certain liabilities and obligations of the Seller relating thereto, all upon the terms and subject to the conditions set forth herein.

D.    The Seller and its Affiliates intend, on or around August 1, 2022, to file voluntary petitions (the "**Petition Date**") for relief under subchapter V of chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, as amended, and collectively with the Federal Rules of Bankruptcy Procedure, the "**Bankruptcy Code**"), commencing bankruptcy proceedings (as may be jointly administered, the "**Bankruptcy Cases**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

E.    The parties intend to effectuate this Agreement and the transactions contemplated hereby under Sections 105, 363, and 365 of the Bankruptcy Code.

F.    This Agreement is subject to approval of the Bankruptcy Court and will be consummated only under the Sale Order (as defined below) to be entered in the Bankruptcy Cases.

---

[1] **Note to Draft:** Special Purpose Vehicle to be formed by Retail Ecommerce Ventures LLC or affiliate prior to Closing.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.1     Purchase and Sale of the Assets**.  Upon the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall sell and deliver to the Buyer, Free and Clear of all Encumbrances (both as defined below), all of the Seller's right, title and interest, direct or indirect, in and to the following (the "**Purchased Assets**"), in each case excluding any Excluded Assets (as defined below):

(a)     all accounts or notes receivable held by the Seller, and any security, claim, remedy, or other right related to any of the foregoing;

(b)     all Contracts (as defined in **Section 2.15**), including, without limitation, IP Agreements, listed on **Schedule 1.1(b)**, as such schedule may be amended by Buyer pursuant to **Section 1.9**, to which the Seller is a party (the "**Assigned Contracts**");

(c)     all Intellectual Property (as defined in **Section 2.14**) either (i) owned by Seller or (ii) purported to be owned by Seller and which is used in connection with the Business, including, without limitation, software, domain name registrations, websites, email addresses, social networking accounts, customer lists, and vendor lists("**Assigned Intellectual Property**");

(d)     all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts, and other inventories;

(e)     all furniture, fixtures, equipment, hardware, machinery, tools, office equipment, computers, and other tangible personal property;

(f)     all of Seller's rights under warranties, indemnities, and all similar rights against third parties arising from or relating to the Business or the Purchased Assets;

(g)     all insurance benefits, including rights and proceeds, arising from or relating to the Business or the Purchased Assets;

(h)     originals, or where not available, copies, of all books and records relating to the Business;

(i)     all Permits;

(j)     all goodwill associated with the Business; and

(k)     all other assets, properties and rights of every kind that are either (i) owned by Seller or (ii) purported to be owned by Seller and which are used in connection

with the Business, whether tangible or intangible, real, personal or mixed, accrued or contingent (including goodwill), related to, used or held for use in connection with the Business, as the same shall exist on the Closing Date, in each case other than Contracts (which Contracts to be included in the Purchased Assets are described in **Section 1.1(b)**).

To the extent that the Ultimate Parent has any right, title or interest, direct or indirect, in or to any of the foregoing assets, properties, or rights related to, used or held for use in connection with the Business, as the same shall exist on the Closing Date ("**Business Related Assets**"), then such Business Related Assets shall be deemed Purchased Assets, and at the Closing, Ultimate Parent shall sell and deliver to the Buyer, Free and Clear of all Encumbrances, all of the Ultimate Parent's right, title and interest, direct or indirect, in and to, such Purchased Assets.

**Section 1.2    Excluded Assets**.  Notwithstanding anything contained in **Section 1.1** to the contrary, the Seller is not selling, and the Buyer is not purchasing, any of the following assets of the Seller, all of which shall be retained by the Seller (collectively, the "**Excluded Assets**"):

(a)    all of the Seller's cash and cash equivalents;

(b)    all rights of the Seller under this Agreement and the Ancillary Agreements (as defined in **Section 1.5**);

(c)    all books and records relating to the corporate organization of Seller including its minute books;

(d)    the stock or other equity interests of Logo, d.o.o., a Serbia corporation, owned by the Seller;

(e)    the Contracts set forth on **Schedule 1.2(e)** as such schedule may be amended by Buyer pursuant to **Section 1.9** (the "**Excluded Contracts**");

(f)    the stock or other equity interests of GetSwift, d.o.o., a Serbia corporation, owned by the Seller;

(g)    causes of action arising under chapter 5 of the Bankruptcy Code; and

(h)    the assets set forth in **Schedule 1.2(h)**.

**Section 1.3    Assumed Liabilities**.  In connection with purchase and sale of the Purchased Assets pursuant to this Agreement, at the Closing, the Buyer shall not assume any liabilities or obligations of the Seller, however or whenever arising, except for the following specified liabilities (collectively, the "**Assumed Liabilities**"):

(a)    all liabilities under any Assigned Contract set forth on **Schedule 1.1(b)** other than liabilities under the Excluded Contracts, to the extent incurred in the ordinary course of business and required to be performed after the Closing; *provided*, *however*, that Assumed Liabilities shall not include any liabilities arising out of or relating

74820387v1

to any breach by the Seller of any provision of any such Contract prior to the Closing in excess of the Cure Cost Cap (as defined below); and

(b)    up to $1,000,000 (such amount, the "**Cure Cost Cap**"), in Buyer's sole discretion, of the software related accounts payable or Cure Costs (as defined below) of the Business set forth in **Schedule 1.3(b)** (the "**Assumed Accounts Payable**").

Section 1.4    **Excluded Liabilities**.    Except for the Assumed Liabilities, notwithstanding any other provision of this Agreement to the contrary or any disclosure to the Buyer, the Buyer is not assuming (and the Seller shall retain without recourse to the Buyer) any liability, debt, obligation, deficiency, tax, penalty, assessment, fine, claim, cause of action, or other loss, fee, cost, or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted (collectively, "**Liabilities**") of the Seller whatsoever, whether direct or indirect, known or unknown, absolute or contingent, matured or unmatured, and currently existing or hereinafter arising (the "**Excluded Liabilities**"). Without limiting the foregoing, Buyer shall not assume any Liabilities incurred by the Seller or any Affiliate of Seller for which the Seller or such Affiliate is responsible for payment in connection with the negotiation of the transactions contemplated by this Agreement (the "**Transactions**") or other sale or disposition of, or exploration of strategic alternatives of, the Business, including: (A) any change-of-control, severance, retention, transaction, stay, incentive, bonus, or similar payment or increased cost that is triggered, accelerated, accrues, or becomes payable in whole or in part in connection with the Transactions, including any employer-side payroll, fees, expenses, social security, unemployment, or similar taxes payable in connection with such payments; (B) any Liability of the Seller under deferred compensation plan, phantom stock plan, severance or bonus plan, or similar arrangement made payable in whole or in part as a result of the Transactions, including any employer-side payroll taxes payable in connection with such payments; or (C) professional fees associated with the Transactions (collectively, the foregoing, ("**Transaction Expenses**") and any such liability or costs shall constitute Excluded Liabilities.

Section 1.5    **Ancillary Agreements**.    On or prior to the Closing Date, the Seller Parties and the Buyer shall execute, and file as necessary, such other documents as are necessary to complete the transfer of the Purchased Assets to, and the assumption of the Assumed Liabilities by, the Buyer (collectively, the "**Ancillary Agreements**") including without limitation:

(a)    a Bill of Sale,

(b)    an Assignment and Assumption Agreement,

(c)    an Intellectual Property Assignment Agreement; and

(d)    the Seller Note (as defined below).

Section 1.6    **Consideration**.    In full consideration for the Purchased Assets, at the Closing, the Buyer shall pay, or cause to be paid, to the Seller a purchase price of up to

$5,300,000 (the "**Purchase Price**") as set forth below.  Specifically, at the Closing, Buyer shall:

(a)     pay an amount in cash equal to $2,800,000 (such net amount, the "**Closing Cash Payment**"), in immediately available funds by wire transfer to the account or accounts set forth in the funds flow statement in form and substance reasonably acceptable to Buyer delivered to Buyer at least two (2) business days prior to the Closing (the "**Funds Flow Statement**") ;

(b)     issue to the Seller an unsecured promissory note in the principal amount of $1,500,000, in the form attached hereto as **EXHIBIT A** (the "**Seller Note**");

(c)     assume up to $1,000,000 Assumed Accounts Payable and Cure Costs; and

**Section 1.7    Closing**.  Subject to the conditions set forth in **ARTICLE VI**, the closing of the sale and purchase of the Purchased Assets (the "**Closing**") will take place at the offices of Koenig, Oelsner, Taylor, Schoenfeld & Gaddis, PC, 2475 Broadway, Boulder, Colorado 80304, at 10:00 a.m. local time on the second business day following the satisfaction or waiver of the conditions set forth in **ARTICLE VI**, or at such other place and time as the parties may otherwise agree, including remotely by exchange of signatures via facsimile, electronic mail (including delivery of a PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com), or any other transmission method, which signatures shall be deemed to have been duly and validly delivered and be valid and effective for all purposes (the date of the Closing, the "**Closing Date**").

**Section 1.8    Intended Tax Treatment; Allocation of Purchase Price**.

(a)     The parties intend that the transactions contemplated by this Agreement constitute, for U.S. federal, state and local income Tax purposes, a taxable purchase by Buyer from the Seller of the Purchased Assets, subject to Sections 483, 1274 and 1275 of the Internal Revenue Code of 1986, as amended (the "**Code**") and Treasury Regulations thereunder  (the "**Intended Tax Treatment**"). The Company and the Selling Parties shall, to the extent consistent with applicable Law, report the federal, state, local and other Tax consequences of the transactions contemplated by this Agreement consistently with the Intended Tax Treatment, and, except as required by applicble Law, neither Buyer nor the Selleing Parties shall take any position inconsistent with the Intended Tax Treatment on any tax return or as part of any tax audit except pursuant to a "determination" within the meaning of Code Secton 1313 or similar provision of applicable state or local applicable Law.

(b)     The parties agree to allocate the consideration paid for the Purchased Assets for tax purposes (to the extent treated as sold in a taxable sale) in accordance with the applicable provisions of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and in accordance with **Schedule 1.8(b)** (the "**Allocation Schedule**").  Buyer shall provide a written schedule showing allocated amounts not specifically set forth in the

Allocation Schedule as soon as reasonably practicable following the Closing (the "**Additional Allocations**").  The Additional Allocations shall, to the maximum extent possible, be consistent with the Allocation Schedule and shall in no event change any of the amounts of allocations specifically set forth in the Allocation Schedule.  No party will file any tax return (including any information return) with any Governmental Authority or other document with, or make any statement or declaration to, any Governmental Body that is inconsistent with the Allocation Schedule or the Additional Allocations except pursuant to a good faith settlement of a tax controversy.

**Section 1.9    Assigned Contracts and Cure Costs.**

(a)    At the Closing, Seller and Buyer shall pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, their respective portion of any and all cure and reinstatement costs or expenses that are required to be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "**Cure Costs**").  Buyer shall pay all Cure Costs up to an amount not to exceed the Cure Cost Cap.  Seller shall pay all Cure Costs, if any, in excess of the Cure Cost Cap.  For the avoidance of doubt, the payment of any Cure Costs called for by this Agreement payable by Buyer shall be made by Buyer in cash at Closing and shall not be deducted from the Closing Cash Payment, but in no event shall Buyer be required to make any payment of Cure Costs for, and shall not assume any liabilities with respect to, any Excluded Contract. In the event Seller fails to timely pay any Cure Costs called for by this Agreement payable by Seller, Buyer may, but is not required to, pay such amount on behalf of Seller and without limiting any of Buyer's other remedies under this Agreement, Buyer may set off and deduct from the Purchase Price any such amount in excess of the Cure Cost Cap.

(b)    **Schedule 1.9(b)** sets forth each Executory Contract and Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Contract (and if no Cure Cost is estimated to be payable in respect of any particular Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00").  Seller shall update the estimated Cure Costs listed in **Schedule 1.9(b)** periodically no later than five (5) days prior to the Bid Deadline and periodically thereafter.  For the avoidance of doubt, except as expressly set forth above with respect to **Schedule 1.9(b)**, Seller may not update, modify, or amend any schedule hereto without the express written consent of Buyer, which may be withheld, conditioned, or delayed in Buyer's sole discretion.   Furthermore, and notwithstanding anything to the contrary, no representation or warranty of Seller or the Selling Parties shall be affected or deemed waived by reason of any investigation made by or on behalf of the Buyer or by reason of the fact that the Buyer knew or should have known that any such representation or warranty is, was or might be inaccurate, and such representations and warranties are qualified solely by reference to the applicable schedule hereto.

(c)    Ten (10) Business Days after Seller has made available to Buyer correct and complete copies of all Contracts listed on **Schedule 1.9(b)**, and subject to Buyer's rights under **Section 1.9(e)** below to subsequently amend such designations, Buyer will deliver to Seller **Schedule 1.1(b)**, to be determined in Buyer's sole discretion, which

shall be a schedule of the Contracts to be assumed by Seller and assigned to Buyer (as Assigned Contracts) at the Closing.  For the avoidance of doubt, Buyer may update **Schedule 1.2(e)** in its sole discretion to reflect any Contracts to be removed from **Schedule 1.9(b).** The Seller shall provide sufficient notice under the Bankruptcy Code and local rules of the Bankruptcy Court to all counterparties to the Assigned Contracts of their assumption and, with respect to the Assigned Contracts to be assumed, also provide a schedule of Cure Costs.

(d)     On the date that is no later than five (5) days after entry of the Bidding Procedures Order (as defined below), the Seller shall deliver a written notice in a form reasonably acceptable to Buyer of the proposed assignments of the Contracts and the proposed Cure Costs for each Contract to all non-debtor parties of Contracts, which notice shall notify each non-debtor party of (i) the proposed Cure Cost for such Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Cost.

(e)     At any time prior to three (3) business days before Closing (the "**Designation Deadline**"), Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Seller (each such notice, a "**Contract Notice**") of Buyer's election to designate any Contract (including any Contract that is an Assigned Contract immediately before such designation) (i) as an Excluded Contract, and upon such designation such Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract or (ii) to the extent not already rejected, as an Assigned Contract and upon such designation such Contract shall constitute an Assigned Contract and shall cease to constitute an Excluded Contract.  If, at any time after the Designation Deadline, the Cure Costs fixed by the Bankruptcy Court for any Assigned Contract are (i) greater than the amount set forth on the initial schedule of Cure Costs filed by Seller with the Bankruptcy Court prior to the Designation Deadline and (ii) are not consented to by Buyer, then Buyer shall be permitted, no later than two (2) business days after entry of an order by the Bankruptcy Court setting such Cure Costs, to provide Seller a Contract Notice of Buyer's election to revoke its designation of any such Contract as an Assigned Contract and thereupon such Contract shall be deemed to be an Excluded Contract for all purposes of this Agreement.  The Parties shall amend and **Schedule 1.9(b)** to reflect changes made pursuant to this **Section 1.9(e)**.  Notwithstanding the foregoing, that certain CXOS Managed Services Contract and Statement of Work, dated September 14, 2020, between Seller and Eplexity, LLC, a Colorado limited liability company (the "**Eplexity Agreement**"), shall constitute an Assigned Contract.

(f)     If Buyer exercises its rights in **Section 1.9(e)** above to change the designation of a Contract from an Assigned Contract to an Excluded Contract, or to change the designation of an Excluded Contract to an Assigned Contract, there shall be no reduction in the Purchase Price as a result of such change in designation.

**Section 1.10   Withholding**.  Buyer will be entitled to deduct and withhold, or from any amounts payable or otherwise deliverable pursuant to this any taxes or other amounts required to be deducted or withheld therefrom under the Code or any applicable Law.  To the extent that any such amounts are so deducted or withheld and paid over to the applicable Governmental Authority, such amounts will be treated for all purposes of this Agreement as

having been paid to the person in respect of which such deduction, withholding and payment
were made.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES REGARDING THE SELLER[2]

The Seller hereby represents and warrants, jointly and severally, to the Buyer as of
the date hereof and as of the Closing Date as provided below in this **ARTICLE II**.  All of
the below representations and warranties shall expire and be of no further force and effect
as of the conclusion of the Closing.

**Section 2.1     Organization and Qualification**.  The Seller is a corporation duly
organized, validly existing and in good standing under the laws of the State of Delaware and
has full corporate power and authority to own, lease and operate the Purchased Assets and
to carry on the Business.  The Seller is duly qualified or licensed as a foreign corporation to
do business, and is in good standing, in each jurisdiction where the ownership or operation
of the Purchased Assets or the nature of the Business makes such qualification or licensing
necessary, except as would not, individually or in the aggregate, have a material adverse
effect on the Purchased Assets or the business, financial condition or results of operations of
the Business (a "**Material Adverse Effect**").

**Section 2.2     Authority**.  The Seller has full corporate power and authority to
execute, deliver and perform its obligations under this Agreement and each of the Ancillary
Agreements.  This Agreement has been, and upon their execution each of the Ancillary
Agreements will have been, duly executed and delivered by the Seller, and is, and upon their
execution each of the Ancillary Agreements will be, legal, valid, binding and enforceable
upon and against the Seller.

**Section 2.3     No Conflict; Required Filings and Consents**.  The execution,
delivery and performance by the Seller of this Agreement and the Ancillary Agreements and
the consummation by the Seller of the transactions contemplated hereby and thereby do not
and will not (i) violate any provision of the certificate of incorporation or bylaws of the
Seller; (ii) violate any federal, state or local statute, law, regulation, order, injunction or
decree ("**Law**") applicable to the Seller, the Business or the Purchased Assets; (iii) except
for the Contracts set forth on **Schedule 2.3** (the "**Contracts Requiring Consent**"), conflict
with, create a breach or default under, require any consent of or notice to or give to any third
party any right of modification, acceleration or cancellation, or result in the creation of any
lien, security interest, charge or encumbrance upon any of the Purchased Assets pursuant to,
any contract, agreement, license, permit or other instrument to which the Seller is a party or
by which the Seller, the Business or any of the Purchased Assets may be bound, affected or
benefited; (iv) allow the imposition of any fees or penalties or require the offering or making
of any payment to a third party on the part of the Seller or the Business; or (v) require any
consent or approval of, registration or filing with, or notice to any federal, state or local

---

[2]

governmental authority or any agency or instrumentality thereof (a "**Governmental Authority**").

**Section 2.4**    **Title to, Condition and Sufficiency of Assets**. Except as set forth on **Schedule 2.14(b)**, the Seller has good and valid title to or a valid leasehold interest in all of the Purchased Assets, and, following entry of the Sale Order, will convey the Purchased Assets to Buyer free and clear, to the maximum extent permitted by Section 363 of the Bankruptcy Code as expressed in the Sale Order ("**Free and Clear**"), of any charge, limitation, condition, mortgage, lien, security interest, adverse claim, encumbrance, Liability, or restriction of any kind (collectively, "**Encumbrances**"), other than Encumbrances for current taxes not yet past due and any other limitations expressly contained in the Sale Order (collectively, "**Permitted Encumbrances**").  Pursuant to the Sale Order, this Agreement and the Ancillary Agreements, the Buyer will acquire good and valid title to or a valid leasehold interest in all of the Purchased Assets, Free and Clear of any Encumbrances other than Permitted Encumbrances.  The Purchased Assets constitute all of the assets and rights used in or necessary for the conduct of the Business as currently conducted.  All tangible personal property included in the Purchased Assets is in all material respects in good operating condition and repair, ordinary wear and tear excepted, and is adequate for the uses to which it is being put.

**Section 2.5**    **Financial Statements**.

(a)    Seller has electronically delivered to Buyer, with receipt confirmed in writing, within three (3) days prior to the date of this Agreement, copies of the audited consolidated balance sheet of the Business as at December 31, 2019, the audited consolidated balance sheet of the Business as at December 31, 2020, and the audited consolidated balance sheet of the Business as at December 31, 2021, and the related audited consolidated statements of income, retained earnings, stockholders' equity and changes in financial position of the Business, together with all related notes and schedules thereto, accompanied by the reports thereon of the Seller's independent auditors (collectively referred to as the "**Financial Statements**") and the unaudited consolidated balance sheet of the Business as at April 30, 2022, and the related consolidated statements of income, retained earnings, stockholders' equity and changes in financial position of the Business, together with all related notes and schedules thereto (collectively referred to as the "**Interim Financial Statements**") . Each of the Financial Statements and the Interim Financial Statements (i) are correct and complete in all material respects and have been prepared in accordance with the books and records of the Seller pertaining to the Business, (ii) have been prepared in accordance with IFRS Standards, high quality global accounting principles used in Canada as in effect from time to time  applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and (iii) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of the Business as at the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein and subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments that will not, individually or in the aggregate, be material.

74820387v1

(b)      The books of account and financial records of the Seller pertaining to the Business are true and correct and have been prepared and are maintained in accordance with sound accounting practice.  The Seller has not made any changes in its accounting practice since December 31, 2021.

Section 2.6    **Absence of Undisclosed Liabilities**.  Except as and to the extent adequately accrued or reserved against in the audited consolidated balance sheet of the Business as at December 31, 2021 (such balance sheet together with all related notes and schedules thereto, the "**Balance Sheet**"), the Seller does not have any liability or obligation of any nature arising out of, relating to or affecting the Business, whether accrued, absolute, contingent or otherwise, and whether or not required by IFRS Standards to be reflected on a balance sheet of the Business, except for liabilities and obligations incurred in the ordinary course of business consistent with past practice since the date of the Balance Sheet.

Section 2.7    **Absence of Certain Changes or Events**.  Since the date of the Balance Sheet:  (i) the Seller has conducted the Business only in the ordinary course consistent with past practice; (ii)  other than the filing of the Bankruptcy Case, no event or development has had or is reasonably likely to have a Material Adverse Effect; (iii)  neither the Business nor the Purchased Assets have suffered any loss, damage, destruction or other casualty affecting any material properties thereof or included therein, whether or not covered by insurance; and (d) the Seller has not taken any action that, if taken after the date of this Agreement, would constitute a violation of **Section 5.1**.

Section 2.8    **Compliance with Law; Permits**.  The Seller is and has been in compliance in all material respects with all Laws applicable to it in connection with the conduct or operation of the Business and the ownership or use of the Purchased Assets.  The Seller is in possession of all permits, licenses and other authorizations of any Governmental Authority ("**Permits**") necessary for it to own, lease and operate the Purchased Assets and to carry on the Business as currently conducted, and is and has been in compliance in all material respects with all such Permits.  There is no basis for the revocation or withdrawal of any Permit, either as a consequence of the transactions contemplated hereby or otherwise.  All such Permits are transferable to the Buyer pursuant to their terms and applicable Law.

Section 2.9    **Litigation**.  Except as set forth on **Schedule 2.9**, there is no claim, action, suit, proceeding, inquiry, investigation or arbitration by or before any governmental, regulatory, administrative, judicial or arbitral body (an "**Action**") pending or threatened (i) in connection with the Business or the Purchased Assets or the Seller's ownership or operation thereof; (ii) to restrain or prevent the consummation of the transactions contemplated hereby; or (iii) that might affect the right of the Buyer to own and operate the Business or the Purchased Assets, nor is there any basis for any of the foregoing.

Section 2.10    **Employee Benefit Plans**.  Except as set forth on **Schedule 2.10**, there are no current employment contracts or consulting agreements by which the Seller in connection with the Business is bound, and no deferred compensation, bonus, incentive compensation, stock option, severance or termination pay agreement or plan or any other employee benefit plan, agreement, arrangement or commitment, whether formal or informal, maintained, entered into or contributed to, or which is required to be maintained, entered

74820387v1

into or contributed to, by the Seller for the benefit of any current or former employee, officer or director of the Business, or with respect to which the Seller has any liability, contingent or otherwise, in connection with the Business (collectively, "**Benefit Plans**").  None of the Benefit Plans is a multiemployer plan (as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), is subject to Title IV of ERISA or Section 412 of the Code, or provides post-employment welfare benefits (except to the extent required by Section 4980B of the Code).  All of the Benefit Plans currently comply, and have complied in the past, both as to form and operation, with the terms of such Benefit Plans and with the applicable provisions of ERISA, the Code and other applicable Law.

**Section 2.11    Labor and Employment Matters**.  The Seller is not a party to any contract or collective bargaining agreement with any labor organization that pertains to any employees, officers or directors of the Business.  No organization or representation question, labor dispute or unfair labor practice or complaint is pending or has been threatened in connection with the Business in the past five years, including, without limitation, with respect to the Seller's classification or misclassification of employees and contractors for purposes of applicable laws, including wage and hour laws.  Nothing herein shall be construed as an obligation of the Buyer to continue the employment of any employee, officer or director of the Business or otherwise to assume any liability for salary, benefits, pension or other benefit plans relating thereto.

**Section 2.12    Real Property**.  The Seller owns no real property.  **Schedule 2.12** sets forth a true and complete list of all real property and interests in real property included in the Purchased Assets and leased or subleased by the Seller or which the Seller otherwise has a right to use or occupy (the "**Leased Real Property**")[3].  The Seller has good and marketable leasehold title to all Leased Real Property, in each case together with all plants, buildings, improvements and fixtures thereon, free and clear of all Encumbrances other than Permitted Encumbrances.  No parcel of Leased Real Property is or is threatened to become subject to any governmental decree or order to be sold or is or is threatened to being condemned, expropriated or otherwise taken by any public authority.  True and complete copies of all leases and title documents (including all amendments) in respect of or affecting any Leased Real Property have been delivered to the Buyer.

**Section 2.13    Taxes**.  The Seller in a timely manner has filed all income tax returns that it was required to file under all federal, state, local and foreign tax laws and all other tax returns and other reports required of it under all federal, state, local and foreign tax laws in connection with the Business and the Purchased Assets.  All such returns and reports are correct and complete in all material respects. The Seller has paid in full all taxes or other amounts due whether or not shown as due on such tax returns, including without limitation (i) all taxes that the Seller is obligated to withhold from amounts paid or payable to or benefits conferred upon employees, creditors and third parties in connection with the Business and the Purchased Assets, and (ii) all amounts of transfer, sales, use and similar taxes that Seller was obligated to collect from third parties.  No tax examinations or audits

---

[3].

of the Seller in connection with the Business or the Purchased Assets are in progress or have taken place during the past 10 years. None of the Purchased Assets are subject to a lien for taxes other than liens that qualify as Permitted Encumbrances. None of the Purchased Assets include an interest in an entity or arrangement classified as a partnership or as a corporation (or association taxable as a corporation) for U.S. federal income tax purposes. None of the Purchased Assets consist of an interest in assets or a business located outside the United States.  The Seller has and will have no unpaid property or similar taxes attributable to the Purchased Assets for any taxable period (or portion thereof) ending on or prior to the Closing Date, which (in the case of a taxable period that includes but does not end on the Closing Date) will be deemed to be the amount of such Taxes for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period.  To the extent Seller has any such unpaid property or similar taxes, such taxes are and shall be Excluded Liabilities.

Section 2.14    Intellectual Property.

(a)    As used in this Agreement:

(i)    "**Intellectual Property**" means all algorithms, application programming interfaces ("**APIs**"), audiovisual components and objects, data, databases, data collections, designs, diagrams, documentation, drawings, flow charts, formulae, images, mask works, models, net lists, network configurations and architectures, schematics, software and firmware code (in any form, including source code and object code), specifications, subroutines, test vectors, uniform resource identifiers including uniform resource locaters ("**URLs**"), user interfaces, web sites (and associated internet domain names), works of authorship, marks (including brand names, product names, logos, and slogans), business forecasts and strategies, customer and supplier lists, financial data, know-how, materials, marketing and development plans, personnel information, procedures, processes, protocols, technical information, tools, trade secrets, apparatuses, concepts, developments, discoveries, ideas and inventions (whether or not patentable or reduced to practice), methods, techniques, and all other forms of information or technology.

(ii)    "**Intellectual Property Rights**" means all past, present, and future rights in or relating to Intellectual Property that may exist or be created under the laws of any jurisdiction in the world (including all rights accruing by virtue of treaties and conventions), including: (A) copyrights, exclusive exploitation rights, moral rights (including all rights of paternity, integrity, disclosure, and withdrawal), mask work rights, and other rights associated with works of authorship (including software, firmware, data, databases, and other data collections); (B) trademark, service mark, trade dress, trade name rights, and internet domain name registrations, together with the goodwill of the business connected with the use of, and symbolized by, the foregoing; (C) trade secret rights; (D) patent and industrial property rights; (E) all other proprietary rights in or relating to, or forms of protection of, Intellectual Property (whether registered or unregistered); (F) all rights in or relating to applications for, and registrations, reissues, renewals, extensions, combinations, continuations (including continuations-in-part), reversions, restorations, recordations, and divisions of, any of the rights referred to in clauses (A) through (E) of this

74820387v1

sentence; and (G) all rights in or relating to past, present, and future income, royalties, damages, and payments due with respect to any of the foregoing, including rights to damages and payments for past, present, or future infringements, misappropriations, or other violations thereof.

(b)    **Schedule 2.14(b)** lists all (i) Assigned Intellectual Property that is the subject of any issuance, registration, application, or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction (including trademark registrations, domain names, and copyright registrations, issued and reissued patents) and pending registrations or applications for any of the foregoing ("**IP Registrations**"); and (ii) Assigned Intellectual Property that is not registered but that is material to the operation of the Business and is documented or readily capable of being documented, excluding: (A) any information in the memory of any person that constitutes education, research and development techniques, personal skillsets or technical expertise; and (B) any other undocumented information that is not codified or implemented within the infrastructure of the Business.  Except for the IP Registrations that are indicated as expired, lapsed, abandoned, dead or inactive in **Schedule 2.14(b)**, all required filings and fees related to IP Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all IP Registrations are otherwise in good standing. The file histories of the United States unexpired, live, pending, or otherwise active IP Registrations are accessible to the public at www.uspto.gov by entry of the application number of the applicable IP Registration.  For each such United States IP Registration, **Schedule 2.14(b)** sets forth the due dates, if any, that will occur over a period of six (6) months from the date of execution of this Agreement.  Seller's patent counsel possesses legal files of materials related to all IP Registrations that constitute patent applications.  A copy of such materials shall be owned and accessible by Buyer by virtue of this Agreement.

(c)    **Schedule 2.14(c)** lists all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions, and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Assigned Intellectual Property or to which the Seller is a party, beneficiary, or otherwise bound ("**IP Agreements**") other than Contracts solely related to: (i) General Software Agreements (defined below); or (ii) the use of any Assigned Intellectual Property by any retailer, reseller, distributor, advertiser, marketer or contractor performing services for or on behalf of Seller in the ordinary course of Business [4].  The term "**General Software Agreement**," as used herein, shall mean shrink-wrap, click-wrap, or other similar agreements for commercially available off-the-shelf software or software-as-a-service (including platform services and data subscription services), publicly-accessible websites, online portals, online platforms, mobile applications and software preloaded onto personal computers, workstations and servers) in each of the foregoing cases that is provided by any third party at no charge or for a fee less than Five Thousand Dollars ($5,000.00) per year or for a total replacement value less than such amount, including any of the foregoing items that are configurable through the use of settings selectable according to user preferences.  Seller has provided Buyer true and complete copies

---

[4]

of all such IP Agreements required to be listed on **Schedule 2.14(c)**, including all modifications, amendments, and supplements thereto and waivers thereunder. Each IP Agreement is valid and binding on Seller and is in full force and effect. Other than as part of Seller's bankruptcy filing, including the assumption, assignment, and cure process under section 365 of the Bankruptcy Code with respect to Assigned Contracts, neither Seller nor, to the Seller's knowledge after reasonable investigation, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) or has provided or received any notice of breach or default of or any intention to terminate, any IP Agreement. Other than as part of Seller's bankruptcy filing, including the assumption, assignment, and cure process under section 365 of the Bankruptcy Code with respect to Assigned Contracts, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any IP Agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.

(d)    Except as set forth on **Schedule 2.14(b)**, Seller is the sole and exclusive legal and beneficial, (and with respect to the IP Registrations, record) owner of all right, title, and interest in and to the Assigned Intellectual Property, and has the valid right to use all other Intellectual Property used in or necessary for the conduct of the Business as currently conducted, in each case, free and clear of Encumbrances, other than Permitted Encumbrances and technology usage restrictions imposed by third parties under IP Agreements. Except as set forth on **Schedule 2.14(b)**, Seller's rights in the Assigned Intellectual Property are valid, subsisting, and enforceable.

(e)    The Assigned Intellectual Property and Intellectual Property licensed under the IP Agreements constitute all of the Intellectual Property necessary to operate the Business as presently conducted. Except as set forth on **Schedule 2.14(b)**, and other than as part of Seller's bankruptcy filing, including the assumption, assignment, and cure process under section 365 of the Bankruptcy Code with respect to Assigned Contracts, the consummation of the Transaction will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other individual or entity in respect of, Buyer's right to own, use or hold for use any Intellectual Property as owned, used or held for use in the conduct of the Business as currently conducted.

(f)    There is no Action (including any oppositions, interferences or re-examinations) settled, pending, or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property Rights of any individual or entity by Seller; (ii) challenging the validity, enforceability, registrability, or ownership of any Assigned Intellectual Property or Intellectual Property Rights therein or Seller's rights with respect to any Assigned Intellectual Property; or (iii) by Seller or, to Seller's Knowledge any other individual or entity, alleging any infringement, misappropriation, dilution, or violation by any individual or entity of any Assigned Intellectual Property or Intellectual Property Rights therein.

(g)    The conduct of the Business as currently and formerly conducted, and the Assigned Intellectual Property and Intellectual Property licensed under the IP Agreements as currently or formerly owned, licensed, or used by Seller, have not infringed,

misappropriated, diluted, or otherwise violated, and have not, do not and will not infringe, dilute, misappropriate, or otherwise violate, the Intellectual Property Rights or other rights of any individual or entity.  Except as set forth on **Schedule 2.14(b)**, no individual or entity has infringed, misappropriated, diluted, or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any Assigned Intellectual Property or Intellectual Property Rights therein.

      **Section 2.15   Contracts**.   **Schedule 2.15** lists all agreements, arrangements or understandings, whether written or oral, relating to the Business or the Purchased Assets, including IP Agreements (each, a "**Contract**").   Each Contract is valid, binding and enforceable, and is in full force and effect.  Except as expressly set forth on **Schedule 2.15**, no party thereto is in default (with or without notice or lapse of time or both).  The Seller has delivered to the Buyer true and complete copies of all Contracts, including any amendments thereto.

      **Section 2.16   Related Party Interests and Transactions**.  Except as set forth on **Schedule 2.16**, there is no agreement, arrangement or understanding in connection with the Business between the Seller and any of its Affiliates, or any officer, director or employee of the Seller or any of its Affiliates or any family member of the foregoing (each of the foregoing Affiliates, officers, directors, employees and family members, a "**Related Party**"), nor any advances or other amounts owing to the Seller or the Business by any Related Party.  No Related Party (i) owns or has owned any interest in any property, assets or rights used in the Business, (ii) is or has been involved in any business dealings or transactions in connection with the Business or any of the Purchased Assets, other than in the ordinary course of business on prevailing market terms or (iii) is or has been employed in the Business.

      **Section 2.17   Subsidiaries**. Except as set forth on **Schedule 2.17**, Seller does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. Seller is not a participant in any joint venture, partnership or similar arrangement.

      **Section 2.18   Brokers**.  No broker, finder or agent will have any claim against the Buyer for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Seller.

      **Section 2.19   Disclosure**.  None of the representations or warranties of the Seller contained in this Agreement or any Ancillary Agreement or any related schedule, certificate or other document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES REGARDING
## ULTIMATE PARENT

      The Seller Parties hereby represent and warrant, jointly and severally, to the Buyer as of the date hereof and as of the Closing Date as provided below in this **ARTICLE III**.

74820387v1

All of the below representations and warranties shall expire and be of no further force and effect as of the conclusion of the Closing:

**Section 3.1    Organization**.  Ultimate Parent is duly formed or organized, validly existing and in good standing under the laws of its jurisdiction of formation.

**Section 3.2    Authority**.  Ultimate Parent has the requisite power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements.  This Agreement has been, and upon its execution each of the Ancillary Agreements will have been, duly executed and delivered by Ultimate Parent, and is, and upon its execution each of the Ancillary Agreements will be, legal, valid, binding and enforceable upon and against Ultimate Parent.

**Section 3.3    No Conflict; Required Filings and Consents**.  The execution, delivery and performance by Ultimate Parent of this Agreement and the Ancillary Agreements and the consummation by Ultimate Parent of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the certificate of incorporation or bylaws of Parent or Ultimate Parent; (ii) violate any Law applicable to Ultimate Parent; or (iii)  require any consent or approval of, registration or filing with, or notice to any Governmental Authority.

**Brokers**.  No broker, finder or agent will have any claim against the Buyer for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of Ultimate Parent.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller Parties as of the date hereof and as of the Closing Date as provided below in this **ARTICLE IV**.  All of the below representations and warranties shall expire and be of no further force and effect as of the conclusion of the Closing:

**Section 4.1    Organization**.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.

**Section 4.2    Authority**.  The Buyer has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it will be a party.  This Agreement has been, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer, and is, and upon their execution each of the Ancillary Agreements to which the Buyer will be a party will be, legal, valid, binding and enforceable upon and against the Buyer.

**Section 4.3    Required Filings and Consents**.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer will be a party and the consummation by the Buyer of the transactions

contemplated hereby and thereby do not and will not require any consent or approval of, registration or filing with, or notice to any Governmental Authority.

**Section 4.4    Brokers**.  No broker, finder or agent will have any claim against the Seller for any fees or commissions in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of the Buyer.

**Section 4.5    Sufficiency of Funds.** Buyer has sufficient cash on hand or will have prior to the Closing other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 4.6    Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 4.7    No Other Representations and Warranties.** BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN AND ONLY TO THE EXTENT PROVIDED HEREIN, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF, IT BEING UNDERSTOOD THAT THE PURCHASED ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS." FURTHERMORE BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSIGNED CONTRACTS FORMING PART OF THE PURCHASED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT.

**ARTICLE V**
**COVENANTS**

**Section 5.1    Conduct of Business Prior to the Closing**.  Except as may be required by the Bankruptcy Court and except as inconsistent with Seller's obligation to seek higher and better offers in the Bankruptcy Cases, between the date of this Agreement and the Closing, unless the Buyer shall otherwise agree in writing, the Seller Parties shall use reasonable best efforts: (i) to cause the Business to be conducted only in the ordinary course consistent with past practice;  (ii) to preserve substantially intact the Purchased Assets and the organization of the Business; (iii) to keep available the services of the current officers, directors, employees and consultants of the Business; and (iv) to preserve the current relationships of the Business with customers, suppliers and other persons with which it has significant business relations.  Without limiting the foregoing, the Seller shall not take (and the Seller Parties shall not consent to any action that would result in Seller taking), without Buyer's prior written consent, on a case by case basis, any action, directly or indirectly (including through a subsidiary or by amendment, merger, consolidation, or otherwise) that:

(a)      results in the redemption or repurchase of any shares of capital stock or other securities of the Seller (other than repurchases of such securities pursuant to agreements with service providers giving Seller the right to repurchase such securities upon the termination of services at no greater than fair market value or the original purchase price therefor (whichever is less);

(b)      except for the filing of the Bankruptcy Cases, results in liquidation, dissolution, or winding up of Seller or any other deemed liquidation event under Seller's charter or other organizational documents;

(c)      results in the declaration or payment to stockholders of any dividend or other distribution;

(d)      results in the acquisition of another company or any of the equity or assets of another company;

(e)      incurs additional indebtedness, excluding debtor-in-possession financing approved by the Bankruptcy Court, trade payables incurred in the ordinary course of business and equipment leases with third parties entered into in the ordinary course of business and with Buyer's prior written consent;

(f)      authorizes any transaction with any stockholder of Seller or any affiliate of any stockholder;

(g)      makes any loan or advance to, or results in the ownership or acquisition of any stock or other securities of, any corporation, partnership, or other entity;

(h)      makes any loan or advance to any person, including, any employee or officer;

(i)      guarantees any indebtedness;

(j)      creates or amends any equity plan, profit sharing plan, phantom equity plan, or other benefit plan or similar plan of Seller;

(k)      materially changes the nature of the Business; or

(l)      makes any change which is otherwise material to the Business other than commencing the Bankruptcy Cases.

**Section 5.2    Covenants Regarding Information**.    From the date of this Agreement until the Closing Date, the Seller Parties shall afford the Buyer and its officers, directors, principals, employees, advisors, auditors, agents, bankers and other representatives (collectively, "**Representatives**") complete access (including for inspection and copying) at all reasonable times to the Purchased Assets and the Seller Parties' Representatives, properties, offices, plants and other facilities, and books and records relating to the Business and the Purchased Assets, and shall furnish the Buyer with such

financial, operating and other data and information in connection with the Business and the Purchased Assets as the Buyer may reasonably request.

**Section 5.3     Notification of Certain Matters**.   The Seller Parties shall give prompt written notice to the Buyer of (i) the occurrence or non-occurrence of any event that would render any representation or warranty of the Seller Parties herein, if made on or immediately following the date of such event, untrue or inaccurate, including any change required with respect to the schedules hereto; (ii) any event, change or development that has had or is reasonably likely to have a Material Adverse Effect; (iii) any failure of the Seller Parties to comply with any covenant or agreement to be complied with by it hereunder or any event or condition that would otherwise result in the nonfulfillment of any of the conditions to the Buyer's obligations hereunder; (iv) any notice or other communication from any person or entity alleging that the consent of such person or entity is or may be required in connection with the consummation of the transactions contemplated by this Agreement; or (e) any Action pending or threatened in connection with the transactions contemplated by this Agreement.  No such notice shall be deemed to cure any breach of any representation or warranty made in this Agreement or have any effect for purposes of determining the satisfaction of the conditions set forth in **Section 6.1**, the compliance by the Seller Parties with any covenant set forth herein.

**Section 5.4     Confidentiality**.   The Seller Parties shall, and shall cause their respective Affiliates and Representatives to, keep confidential, disclose only to its Affiliates or Representatives and use only in connection with the transactions contemplated by this Agreement all information and data obtained by them from the Buyer or its Affiliates or Representatives relating to the Buyer or its Affiliates or the transactions contemplated hereby (other than information or data that is or becomes available to the public other than as a result of a breach of this section), unless disclosure of such information or data is required by applicable Law.  Notwithstanding anything to the contrary, this section shall survive any termination of this Agreement.

**Section 5.5     Further Assurances**.   Each of the parties agrees to work diligently, expeditiously and in good faith to consummate the transactions contemplated by this Agreement.  From time to time after the Closing Date, the Seller and its Affiliates shall execute and deliver to the Buyer such instruments of sale, transfer, conveyance, assignment, consent, assurance, power of attorney, and other such instruments as may be reasonably requested by the Buyer in order to vest in the Buyer all right, title, and interest in and to the Purchased Assets and the Business.  The Buyer and the Seller Parties shall each provide the other with such assistance as reasonably may be requested by the other in connection with the transition of the Business and the preparation of any tax return, an audit or examination of any such return by any taxing authority or any judicial or administrative proceeding relating to liability for taxes and provide the other with any records or other information which may be relevant to such a return, audit, examination or proceeding.  Before disposing of any such records or other information, Buyer and Seller shall each provide the other with the opportunity to receive copies of such items.  Seller's obligations under this **Section 5.5** shall be limited to the extent that Seller has employees or agents available for such purposes and nothing in this **Section 5.5** shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.

**Section 5.6    Certain Tax Matters.** All transfer, documentary, sales, use, stamp, registration and other such taxes, and any conveyance fees or recording charges incurred in connection with the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**"), will be paid by Seller when due, and Seller will prepare and file all necessary tax returns and other documentation with respect to all such taxes, fees and charges and, if required by applicable Law, Buyer will execute any such tax returns and other documentation. The Buyer and the Seller agree, upon the request of any party hereto and at such party's sole expense, to use their commercially reasonable efforts to obtain any certificates or other documents from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Transfer Taxes.

**ARTICLE VI**
**CONDITIONS TO CLOSING**

**Section 6.1    Conditions to the Obligations of the Buyer**. The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Buyer in its sole discretion:

(a)    The representations and warranties of the Seller Parties contained in this Agreement shall be true and correct in all material respects (other than representations and warranties that are qualified as to materiality, which representations and warranties shall be true and correct in all respects), both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date. The Seller Parties shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing. The Buyer shall have received a certificate of a duly authorized officer of the Seller to the effect set forth in the preceding sentences.

(b)    No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(c)    No Action shall be pending or threatened (i) challenging the transactions contemplated by this Agreement or otherwise seeking damages in connection therewith or (ii) seeking to prohibit or limit the ability of the Buyer to own, operate or control the Business or the Purchased Assets.

(d)    The Seller shall have delivered to the Buyer copies of authorizing resolutions of its Board of Directors, Parent (to the extent required) and Ultimate Parent, authorizing the filing of the Bankruptcy Cases and the execution, delivery and performance of this Agreement and the transactions contemplated thereby.

(e)    The Buyer shall have received executed originals of all consents, waivers, approvals and authorizations required by law, statute, rule, regulation, contract or agreement to be obtained by the Seller Parties in connection with the consummation of the transactions contemplated by this Agreement.

74820387v1

(f)      Substantially all of the employees of the Business as of the date this agreement is signed shall have accepted offers of employment with Buyer pursuant to offer letters in such form as provided by the Buyer.

(g)      The Buyer shall have received an executed original of each of the Ancillary Agreements.

(h)      The Buyer shall have received such other documents relating to the Business, the Purchased Assets and the transactions contemplated hereby as the Buyer may reasonably request.

(i)      Since the date of the Interim Financial Statements and except as disclosed on **Schedule 2.7**, no event or circumstance shall have occurred that, with or without notice or lapse of time or both, would constitute or be reasonable likely to constitute a Material Adverse Effect.

(j)      The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect, shall be a final order in all respects, shall not have been modified, amended, rescinded or vacated in any material respect, and shall not be subject to a stay pending appeal.

(k)      The Eplexity Agreement shall, upon payment of applicable Cure Costs, be assumed, in full force and effect, and no defaults shall exist.

(l)      Seller shall have delivered to the Buyer a properly completed and executed Internal Revenue Service Form W-9 certifying Seller's status as a U.S. person as defined in the instructions to such form.

**Section 6.2      Conditions to the Obligations of the Seller**.  The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Seller in its sole discretion:

(a)      The representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects both when made and as of the Closing Date, or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date. The Buyer shall have performed all covenants and agreements required by this Agreement to be performed by it prior to or at the Closing.  The Seller shall have received a certificate of a duly authorized officer of the Buyer to the effect set forth in the preceding sentences.

(b)      No Governmental Authority shall have enacted, issued, promulgated or enforced any Law that prohibits the consummation of the transactions contemplated by this Agreement.

(c)      The Seller shall have received an executed original of each of the Ancillary Agreements.

**ARTICLE VII**
**TERMINATION**

**Section 7.1**    **Termination**.  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer upon written notice to the Seller:

(i)    if Buyer is not then in material breach of any provision of this Agreement and there has been a material breach of, inaccuracy in, or failure to perform any representation, warranty, agreement, or covenant of Seller in this Agreement, in each case which would result in the failure of any of the conditions specified in **Section 6.1** and such breach, inaccuracy, or failure cannot reasonably be cured by Seller on or before October 3, 2022 (the **"Drop Dead Date"**);

(ii)    for any reason or for no reason at any time after the Drop Dead Date;

(c)    by Seller upon written notice to Buyer if Seller is not then in material breach of any provision of this Agreement (including, without limitation, **Section 5.5**) and there has been a material breach of, inaccuracy in, or failure to perform any representation, warranty, agreement, or covenant of Buyer in this Agreement, in each case which would result in the failure of any of the conditions specified in **Section 6.2**, and such breach, inaccuracy, or failure cannot reasonably be cured by Buyer on or before the Drop Dead Date; or

(d)    by Seller or Buyer upon written notice to the other party:

(i)    if the Sale Order is not entered by the Drop Dead Date;

(ii)    if the Bankruptcy Court enters an order dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to a proceeding under chapter 7 of the Bankruptcy Code; or

(iii)    if the Seller consummates, with any party other than Buyer, (x) the sale of a substantial portion of the Purchased Assets or (y) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving all or a substantial portion of the Purchased Assets (collectively, an **"Alternative Transaction"**); *provided*, that Buyer's right to terminate under this **Section 7.1(d)(iii)** is subject to **Section 8.3**.

**Section 7.2**    **Effect of Termination.**

(a)    In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except that:

(i)    **Section 5.4**, this **ARTICLE VII**, and **ARTICLE VIII** shall survive; and

(ii)    that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.

(b)    *Omitted.*

## ARTICLE VIII
## GENERAL PROVISIONS

**Section 8.1    Bankruptcy Court Approval.**

(a)    Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets and the assumption and assignment of the Assigned Contracts and are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance under the Assigned Contracts.

(b)    *Omitted.*

(c)    From and after the date of execution of this Agreement and prior to the Closing or the termination of this Agreement in accordance with **Section 8.1**, Seller shall not take any action which is intended to (or is reasonably likely to) or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

**Section 8.2    Bankruptcy Filings.**

(a)    Seller shall file the form of the Order (A) Authorizing the Sale of Substantially All of the Assets of GetSwift, Inc., Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption or Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief, which is attached hereto as **EXHIBIT B** (acceptable in form an substance to Buyer in its reasonable discretion, the "**Sale Order**"), a proposed version of which shall be filed in the Bankruptcy Case as soon as reasonably practicable prior to the hearing on the entry of the Sale Order.  Subject to **Section 9.1**, Seller shall pursue diligently the entry of the Sale Order.  Buyer agrees that it shall promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court

for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event that the entry of the Sale Order is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation).  Notwithstanding the foregoing, any resulting changes to this Agreement or any related document or resulting material changes to the Sale Order shall be subject to the approval of Buyer in its reasonable discretion.  Seller shall (i) provide Buyer with drafts of the motion seeking entry of the Sale Order and the bidding procedures, the form of which is attached hereto as **EXHIBIT C** (the "**Bidding Procedures**"), the motion seeking entry of the Bidding Procedures, the form of order approving the Bidding Procedures, the form of which is attached hereto as **EXHIBIT D** (the "**Bidding Procedures Order**").

(b)    Seller acknowledges and agrees, and the Sale Order shall provide, among other things, that, on the Closing Date and concurrently with the Closing, all then existing or thereafter Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) of, against or created by Seller or the bankruptcy estates and in existence on or prior to the Closing Date shall be fully released from and with respect to the Purchased Assets, which shall be transferred to Buyer Free and Clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities).

**Section 8.3    Back-Up Bidder.** If an Auction (as defined in the Bidding Procedures) is conducted and Seller does not choose Buyer as the Successful Bidder (as defined in the Bidding Procedures), but instead chooses Buyer as the Back-Up Bidder (as defined in the Bidding Procedures), Buyer will be the Back-Up Bidder.  If Buyer is chosen as the Back-Up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as may be amended with both Parties' written consent prior to or at the Auction) open and irrevocable until the closing of the sale of the Purchased Assets to the Successful Bidder; *provided* that in no event shall Buyer be required to keep its bid to consummate the transactions contemplated by this Agreement open and irrevocable after the Drop Dead Date. If the Successful Bid with the Successful Bidder is terminated prior to closing but before the Drop Dead Date, Buyer will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be amended with both Parties' written consent prior to or at the Auction). In the event that the transaction with the Successful Bidder timely closes and Buyer remains as the Back Up Bidder, however, Buyer's deposit shall be returned in full as provided in the Bidding Procedures.

**Section 8.4    Fees and Expenses**.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the party incurring such fees or expenses, whether or not such transactions are consummated; *provided*, that no such fees and expenses payable by the Seller shall be paid from any assets otherwise transferable to the Buyer pursuant hereto.

**Section 8.5    Amendment and Modification**.    This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each party.

**Section 8.6    Waiver**.    No failure or delay of either party in exercising any right or remedy hereunder shall operate as a waiver thereof.    Any such waiver by a party shall be valid only if set forth in writing by such party.

**Section 8.7    Notices**.    All notices and other communications hereunder shall be in writing and shall be deemed duly given if delivered personally or sent by facsimile, email, overnight courier or registered or certified mail, postage prepaid, to the address set forth on the signature pages hereto opposite the party to receive such notice, or to such other address as may be designated in writing by such party.

**Section 8.8    Entire Agreement**.    This Agreement constitutes the entire agreement, and supersedes all prior written agreements, arrangements and understandings and all prior and contemporaneous oral agreements, arrangements and understandings between the parties with respect to the subject matter of this Agreement.    No party to this Agreement shall have any legal obligation to enter into the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the parties.

**Section 8.9    Third-Party Beneficiaries**.    Except as provided in Article VI, nothing in this Agreement shall confer upon any person other than the parties and their respective successors and permitted assigns any right of any nature.

**Section 8.10    Governing Law**.    This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware.

**Section 8.11    Assignment; Successors**.    This Agreement may not be assigned by either party without the prior written consent of the other party, except that the Buyer may assign this Agreement to any of its Affiliates.    Subject to the preceding sentence, this Agreement will be binding upon the parties and their respective successors and assigns.

**Section 8.12    Definition of "Affiliate."**    For the purposes of this Agreement, the term "**Affiliate**" shall mean any entity controlling, controlled by or under common control with the named party.

**Section 8.13    Severability**.    If any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

**Section 8.14    Counterparts**.  This Agreement may be executed in counterparts, all
of which shall be considered one and the same instrument and shall become effective when
one or more counterparts have been signed by each of the parties and delivered to the other
party.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the Buyer and the Seller have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**                                    **BUYER:**

**GETSWIFT, INC.**                             [_____]5


                                               By: _____
By: _____           Name:_____
Name:  Joel Macdonald                          Title:_____
Title:  President

                                               Address for Notices:

                                               c/o Taft Stettinius & Hollister LLP
Address for Notices:                           200 Public Square, #3500
                                               Cleveland, OH 44114
c/o Barclay Damon LLP                          Attention:  Mark Fazio
1270 Avenue of the Americas, Suite 501
New York, NY 10020
Attention:  Janice B. Grubin
**ULTIMATE PARENT:**

**GETSWIFT TECHNOLOGIES LIMITED**




By: _____

Name:  Joel Macdonald
Title:  President



Address for Notices:

c/o Barclay Damon LLP
1270 Avenue of the Americas, Suite 501
New York, NY 10020
Attention:  Janice B. Grubin

---

5 **Note to Draft**: Special purpose vehicle to be formed by Retail Ecommerce Ventures LLC or affiliate prior to Closing.

EXHIBIT A

SELLER NOTE

**EXHIBIT B**

**SALE ORDER**

## EXHIBIT C

## BIDDING PROCEDURES

## Exhibit D

## Bidding Procedures Order

{00650926 - 2}